UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| ILLINOIS LEAGUE OF ADVOCATES ) <br> FOR THE DEVELOPMENTALLY, ) <br> DISABLED, *et al.* ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> PATRICK QUINN, *et al.* ) <br> ) <br> Defendants. ) <br> ) | Case No. 13 C 1300 <br> Judge Marvin E. Aspen |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

Presently before us is Plaintiffs' motion for preliminary injunction. (Dkt. No. 8.) Based on the parties' briefs, their supporting affidavits and exhibits, and our review of the Second Amended Complaint ("SAC"), we conclude that we have subject matter jurisdiction only over the claims Plaintiffs brought on behalf of the current and former residents of the Murray Developmental Center ("Murray") and the Jacksonville Developmental Center ("Jacksonville"), related to their allegedly harmful transfers out of those facilities. The claims premised on the future closures of other State Operated Development Centers ("SODCs") in Illinois are not ripe. We dismiss those claims without prejudice, for the reasons stated below. We also briefly comment on the nature of the claims brought under the Americans with Disabilities Act.

### BACKGROUND

SODCs are state operated residential facilities that provide care and services to severely developmentally disabled adults in Illinois. (Mem. at 2–3.) According to Plaintiffs, Defendants

have begun to implement a plan to close down all SODCs in the state and transfer the residents to Community Integrated Living Arrangements ("CILAs"), which Plaintiffs claim are inadequate to suit the needs of many SODC residents. (*Id.* at 4–6.) One SODC, Jacksonville, was closed December 3, 2012, and another, Murray, is currently in the process of transferring residents in preparation for its closure on October 31, 2012.[1] (*Id.* at 6–7; SAC ¶ 52.)

Plaintiffs seek to represent a class comprised of all Illinois SODC residents since January 1, 2011 who oppose placement in a CILA. (SAC ¶ 42.) Plaintiffs claim that Defendants are conducting the transfers in a manner the fails to properly assess the needs of the residents and forces them into CILAs under harmful and dangerous circumstances. (*Id.* ¶ 59; Mem. at 4–6.) They also allege that Defendants' plan to close all SODCs discriminates against the proposed class because "it targets developmental disabilities for greater reduction in funding than other disabilities. It also discriminates against [the proposed class] because it eliminates an entire category of service, the one that cares for the most severely challenged persons and effectively withdraws treatment and care for them with no equivalent replacement." (Mem. at 11–12.) Plaintiffs filed their motion for preliminary injunction on February 27, 2013, which is scheduled to be heard on July 23, 2013. (Dkt. Nos. 8, 89.)

Although we will touch briefly on a substantive issue, this order primarily addresses our jurisdiction over Plaintiffs' claims with respect to the issue of ripeness. "Jurisdiction is the power to declare law and without it the federal courts cannot proceed. Accordingly, not only

---

[1] Pursuant to our Temporary Restraining Order dated June 12, 2013 (Dkt. No. 90), Defendants have stopped transferring Murray residents while the motion for preliminary injunction is pending.

may the federal courts police subject matter jurisdiction *sua sponte*, they must." *Wernsing v. Thompson*, 423 F.3d 732, 743 (7th Cir. 2005).

## I.  RIPENESS

"The doctrine of ripeness focuses on the conduct of the defendant to determine whether the defendants actions have harmed, are harming, or are about to harm the plaintiff." *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337 (Fed. Cir. 2007); *Pfizer Inc. v. Apotex Inc.*, 726 F. Supp. 2d 921, 933 (N.D. Ill. 2010). It is well established that "one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pfizer*, 726 F. Supp. 2d at 933 (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140, 95 S. Ct. 335, 357 (1974)). But a claim premised on future harm is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Harris v. Quinn*, 656 F.3d 692, 700 (7th Cir. 2011).

Plaintiffs' claims in this case are based on two types of harm. The first type of harm arises from the transfers of SODC residents into CILAs that are not equipped to properly care for them. The second type of harm is the discrimination that Plaintiffs allegedly face because of Defendants' decision to close all SODCs in Illinois.

### A.  Claims arising out of harmful transfers

Defendants do not dispute that Murray is closing and that they will continue to transfer Murray residents to CILAs. (Resp. at 2–3.) Neither do they dispute that they have already closed Jacksonville and transferred at least some of those residents to CILAs. (*Id.*) Plaintiffs' allegations in the SAC and motion for preliminary injunction, as well as their supporting

affidavits, point to specific circumstances underlying their claim that these transfers are harmful to residents who are not suited to live outside of an SODC. (Mem. at 5–6; Reply, Ex. A–D.)

We make no determination at this time regarding the merits of any claim, but based on the materials before us, we conclude that the harms arising from the future transfers of Murray residents are not hypothetical or speculative. Absent the present lawsuit, the transfers from Murray certainly will continue. Plaintiffs have offered sufficient allegations and affidavit testimony to establish, solely for the purposes of determining jurisdiction, that the transfers will result in harm to at least some of the residents. Accordingly, we hold the claims of current and former Murray and Jacksonville residents related to their past or impending transfers are ripe for judicial review.

With respect to the residents of other SODCs, however, claims premised on future harmful transfers are not yet ripe. "Inquiries into ripeness generally address two factors: first, whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and, second, whether the parties would suffer any hardship by the postponement of judicial action." *Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cnty., Ind.*, 977 F.2d 287, 288–89 (7th Cir. 1992); *Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 963 (N.D. Ill. 2012). Neither factor favors the exercise of jurisdiction over the claims related to future SODC closures.

The harms arising from the past and impending transfers of Murray and Jacksonville residents are very fact-specific. They depend on the details of the Defendants' assessment process, the circumstances of the specific CILAs receiving the residents, and needs of the individual residents. *See, e.g.*, Reply, Ex. C–D (describing the particular needs of the affiant's

relatives at Murray, and the specific risks of community placement for those individuals). We cannot conclude without further factual development that the harms arising from the particular circumstances at Murray and Jacksonville will necessarily arise as other SODCs close. Until the particulars of the transfer process at the other SODCs become more evident, there is no way for us to know what harms, if any, those residents face. Under these circumstances, any decision we could make with respect to those future transfers would be no more than an advisory opinion dictating to the State how to proceed. Furthermore, postponing judicial action will not impose any hardship on the residents of the other SODCs. These facilities are not currently closing, and the residents are not at immediate risk of transfer. (Resp. at 5.) No judicial action is necessary to protect their interests at this time.

Thus, the claims of residents in the other SODCs related to their possible future transfers are not ripe, and we therefore lack jurisdiction over those claims.

### B. The discriminatory elimination of all SODCs

The second type of harm underlying Plaintiffs' claims is the discrimination Plaintiffs allegedly face as a result of the closure of all SODCs. This alleged discrimination is hypothetical and speculative, however, because "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Harris*, 656 F.3d at 700.

The parties dispute whether Defendants actually plan to close all of the SODCs. Plaintiffs have submitted affidavits from two Murray employees testifying that they attended a meeting at which Michael Gelder, a senior advisor to Governor Quinn, stated that Defendants are planning to close all of the SODCs in Illinois. (Reply, Exs. A and B.) Plaintiffs have also submitted affidavits from two parents of residents at Murray, who testify that state officials have

told them that all SODCs will close. (*Id.*, Exs. C and D.) Additionally, Plaintiffs submit a document entitled "Governor Quinn's Rebalancing Initiative—November 2011." (*Id.*, Ex. E.) According to that document, Defendants "will reduce the number of residents served by [SODCs] by at least 600 by the end of FY 14. This will permit [Defendants] to close up to four facilities in the next 2.5 years." (*Id.*) In response, Defendants submit the testimony of Defendant Kevin Casey, the Director of the Division of Developmental Disabilities at the Illinois Department of Human Services, who is responsible for overseeing transfers of SODC residents to CILAs. (Resp., Ex A ¶¶ 1–2.) Mr. Casey states that other than Murray, "[n]o other SODC has been slated for closure to date. I am not aware of any plan to close every SODC in the State of Illinois." (*Id.* ¶ 19.)

With this evidence before us[2], we hold that the closure of all SODCs in the State of Illinois is speculative at this point. Assuming for the present purposes that the document submitted by Plaintiffs is an accurate description of Defendants' intentions, it shows that the State only plans to close "up to four facilities" by the end 2014. And while we do not doubt the veracity of Plaintiffs' affidavits, we do not believe that the statements described therein mean that the closure of all SODCs in Illinois is even close to certain. The statements of government officials are not necessarily true predictors of their future behavior. Even if Defendants do presently intend to close the last SODCs in the state sometime after 2014, which they dispute,

---

[2] "It is proper for the district court to look beyond the jurisdictional allegations in the complaint and to view whatever evidence has been submitted in determining whether subject matter jurisdiction exists." *Roman v. U.S. Postal Serv.*, 821 F.2d 382, 385 (7th Cir. 1987); *see also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).

their ability to carry out the closures depends on too many unforeseeable factors—shifting political considerations, economic factors, electoral results, and ongoing policy reassessments over the next two or three years—for us to conclude at this time that the alleged harm is imminent.

Plaintiffs urge us to consider *Sierra Club v. Franklin County Power of Illinois, LLC*, where the plaintiff brought a claim based in part on the future health and environmental harms posed by the construction of a coal power plant. 546 F.3d 918, 925–26 (7th Cir. 2008). In that case, the Seventh Circuit held that the harm was not speculative, because construction of the power plant was already underway and the defendants had unequivocally stated their intention to complete construction. *Id.* at 926. Plaintiffs argue that the statements of the government officials here create the same level of certainty regarding future harm as the statements of the defendants in *Sierra Club*. (Reply at 4.) But while the defendants in *Sierra Club* did not dispute their intention to complete construction of the power plant, Defendants here do dispute their intention to close all SODCs. And the only public statement we have seen from Defendants is the Rebalancing Initiative, describing a plan to close four SODCs by 2014. (Reply Ex. E.) This document undercuts any statements that government officials made privately to Murray staff and family. Therefore, the possibility of harm in this case is decidedly more tenuous than the future harm alleged in *Sierra Club*.

We find this case more analogous to the situation facing the Eleventh Circuit in *Association for Children for Enforcement of Support, Inc. v. Conger*, 899 F.2d 1164 (11th Cir. 1990). In that case, a state-court judge privately informed the plaintiffs, a child-support advocacy group, that he would no longer allow observers in court during child-support hearings.

*Id.* at 1165. The plaintiffs sued, claiming that the judge's policy violated their First and Fourteenth Amendment rights. *Id.* At the time of the lawsuit, however, the judge had not actually excluded the plaintiffs from any hearing. The court found that "this is plainly the type of hypothetical case we should avoid deciding." *Id.* at 1166. It explained that "we do not generally decide cases based on a party's predicted conduct. Of course, if the injury is certainly impending, that is enough. In this case, however, we are faced only with an unofficial 'policy' announced in an informal setting." *Id.*

Similarly here the statements on which Plaintiffs rely are too informal to amount to an official, enforceable government policy that might give rise to imminent future harm. The State has not taken any concrete steps to close any SODCs beyond the four mentioned in the Rebalancing Initiative, or publically announced official plans to do so. Under these circumstances, claims based on the harms caused by the elimination of all SODCs are not yet ripe for judicial review.

## II.   TITLE II CLAIMS

We turn now to briefly address the nature of the claims brought by Plaintiffs under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.[3] Plaintiffs contend that Defendants' plan violates the ADA because it targets the developmentally disabled residents of SODCs for greater reductions in funding than those faced by other disabled individuals. (SAC ¶¶ 65, 78; Mem. at 11–13.) According to Plaintiffs, the reduction in funding prevents the

---

[3] "In view of the similarities between the relevant provisions of the ADA and the Rehabilitation Act and their implementing regulations, courts construe and apply them in a consistent manner." *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004); *see, e.g.*, 29 U.S.C. § 794(a). Accordingly, this discussion applies equally to Plaintiffs' Rehabilitation Act claims, asserted in Count II of the SAC.

potential class members from receiving services that are as effective as those offered other disabled individuals and deprives them of the right to live in the most integrated setting appropriate for their needs. (SAC ¶¶ 65, 78; Mem. at 11–13.)

In support of their claims, Plaintiffs cite to the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, which held that Title II requires states to provide community-based treatment for disabled persons, as opposed to institutionalization, under specified circumstances. 527 U.S. 581, 587, 597, 601–07, 119 S. Ct. 2276, 2181, 2185, 2187–90 (1999). In so holding, the Supreme Court explained that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597, 119 S. Ct. at 2187. The court acknowledged that integrated placement might never be appropriate for some individuals and, moreover, that the ADA should not be read to require "States to phase out institutions, placing patients in need of close care at risk." *Id.* at 605, 119 S. Ct. at 2189. The court further explained that a state's obligation to provide integrated care for qualified, consenting individuals "is not boundless" and may be curtailed if the state shows that the requested modification would entail a fundamental alteration of its services. *Id.* at 603–06, 119 S. Ct. at 2188–90.

Although some of the general principles set forth in *Olmstead* are relevant to the present matter, we find that this is not an *Olmstead* case. Plaintiffs do not claim they have been or will be deprived of placement in a community living environment—quite the contrary. They oppose such placement and, thus, do not fall within *Olmstead*'s purview. *Id.* at 602–07, 119 S. Ct. at 2187–90 (holding that a state's duty arises only where eligible disabled individuals "do not oppose such treatment"). Unjustified isolation constitutes discrimination under the ADA, but—based on our close reading of *Olmstead* and the few relevant authorities—"it does not follow

-9-

from *Olmstead* that the converse is true."[4] *Richard S. v. Dep't of Developmental Servs. of the State of Cal.*, No. 97 C 219, 2000 WL 35944246, at *3 (C.D. Cal. Mar. 27, 2000); *Richard C. ex rel. Kathy B. v. Houstoun*, 196 F.R.D. 288, 292 (W.D. Pa. 1999) ("[I]t does not logically follow that institutionalization is required if any one of the three *Olmstead* criteria is not met."); *Black v. Dep't of Mental Health*, 83 Cal. App. 4th 739, 753–55, 100 Cal. Rptr. 2d 39, 48–50 (Cal. Ct. App. 2000) (placement of unqualified disabled man in community setting without guardian's consent "might have been medically improper" but "did not violate the integration mandate").

With that in mind, we turn to consideration of how Plaintiffs' claims fit under Title II. The SAC does not specify the type of Title II claims asserted by Plaintiffs, but there are three possible avenues. "A Title II claim under the ADA 'may be established by evidence that (1) the defendant intentionally acted on the basis of disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" *Wis. Comm. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (quoting *Washington v. Ind. High School Athletic Assoc.*, 181 F.3d 840, 847 (7th Cir. 1999)). In preparation for the hearing, we admonish the parties to tailor their presentations on the ADA and Rehabilitation Act claims to the elements of—and any available defenses to—these theories. If

---

[4] Two federal circuit courts of appeal have declined to address the specific question of whether disabled individuals have a cognizable right to continued institutionalization. *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774 (7th Cir. 2007) (assuming, without deciding, that proposed intervenors had a legal interest in their continued institutionalization); *Benjamin ex rel. Yock v. Dep't of Public Welfare of the Commonwealth of Pa.*, 432 F. App'x 94, 98 (3d Cir. 2011) (denying intervention motion at the merits stage without reaching the question of whether the proposed intervenors "have a legally enforceable right to remain in the institution where they currently reside"); *see also Benjamin ex rel. Yock v. Dep't of Public Welfare of the Commonwealth of Pa.*, 701 F.3d 938, 954–57 (3d Cir. 2012) (allowing disabled individuals opposed to community placement to intervene because the terms of a settlement agreement could lead to their integration in the future, giving them a sufficient interest in the remedy phase of the litigation).

Plaintiffs do not intend to pursue each of the three Title II theories, they should inform Defendants and the court as soon as possible.

## CONCLUSION

For the reasons stated above, we hold that our jurisdiction in this case extends only to the claims Plaintiffs brought on behalf of the current and former residents of the Murray and Jacksonville SODCs, related to their allegedly harmful transfers out of those facilities. We dismiss without prejudice all of Plaintiffs' claims premised on the future closure of other SODCs in Illinois. The evidence of the parties presented at the July 23, 2013 hearing on the preliminary injunction motion shall be confined to those issues within our subject matter jurisdiction and as set forth in this holding. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: June 20, 2013