## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| ILLINOIS LEAGUE OF ADVOCATES FOR THE DEVELOPMENTALLY, DISABLED, *et al.* | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 13 C 1300 Judge Marvin E. Aspen |
| PATRICK QUINN, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MARVIN E. ASPEN, District Court Judge:

Presently before us is Defendants'[1] motion to dismiss Plaintiffs' second amended complaint. (Dkt. No. 162.) As discussed below, the motion is granted in part and denied in part.

## BACKGROUND[2]

In their five-count complaint, Plaintiffs seek to represent a class comprised of developmentally disabled individuals who, at any time since January 1, 2011, currently reside or formerly resided at one of two state operated development centers ("SODCs")—Jacksonville and

---

[1] Defendants Illinois Department of Human Services ("DHS"), Kevin Casey, Michelle R.B. Saddler, and Patrick Quinn filed the motion to dismiss on August 9, 2013. Defendant Community Resource Associates, Inc. ("CRA"), named in the complaint as Community Resource Alliance, adopted the pending motion on August 13, 2013.

[2] We assume familiarity with the background of this case, previously recounted in other opinions, and will discuss specific allegations in more detail where necessary to our analysis.

Murray[3]—and who oppose transfer from their SODC home to a community integrated living arrangement ("CILA").[4]  (Compl. ¶¶ 1–4, 42–50, 58.)  Based on their profound disabilities, the putative class members are entitled to receive a level of care and treatment known as ICF/MR services (Intermediate Care Facility of the Mentally Retarded).  These services are available at three types of facilities: (1) private facilities, known as ICF-DDs (Intermediate Care Facility for Persons with Developmental Disabilities); (2) SODCs; or (3) CILAs, under certain circumstances.  (*Id.* ¶¶ 19–20, 74, 93–94, 98; *see* Pls.' Br. ISO Legal Theory (Dkt. No. 159) at 4–5.)  Plaintiffs allege that the State of Illinois' decision to close the Murray and Jacksonville SODCs for budgetary reasons and force the disabled residents to move into CILAs violates federal law.

According to Plaintiffs, community-based placements are unsuitable for the needs of the profoundly disabled class members and pose serious threats to their physical safety and emotional well-being.  (Compl. ¶¶ 3, 6–7, 25–27, 31–34, 57–61 & Ex. B (Winkeler & Kelly

---

[3] Jacksonville closed on or about December 3, 2012.  (Compl. ¶ 52, 56–57.)  Murray had been slated to close on October 31, 2013, though this litigation has delayed that process.  (*Id.* ¶ 52.)  Pursuant to our temporary restraining order dated June 12, 2013, (Dkt. No. 90), Murray residents may not be transferred without the consent of their legal guardians.  A preliminary injunction hearing is scheduled for January 6, 2014 with respect to the residents and closure of Murray.

[4] The complaint originally asserted class claims covering all Illinois SODC residents since January 1, 2011, consistent with Plaintiffs' allegation that the State intends to close all SODCs.  (Compl. ¶¶ 2–4, 6–7, 42, 60, 62.)  We previously dismissed Plaintiffs' claims on behalf of residents at SODCs other than Jacksonville and Murray.  We concluded that we lacked jurisdiction over those claims because they were speculative and not yet ripe for judicial review.  (6/20/13 Op., Dkt. No. 98.)
    We also previously dismissed claims asserted on behalf of class members who are wards of the Office of the Special Guardian.  (7/18/13 Op., Dkt. No. 135.)  We lack jurisdiction over those claims, which are now pending in a lawsuit filed in the Circuit Court of Clinton County, Illinois (Case No. 2013 CH 49).

Affs.).)  As a result, Plaintiffs have refused to consent to CILA transfers.  Plaintiffs further allege that Defendants have not offered spots at other SODCs or adequate replacement services equivalent to those offered at SODCs.  Plaintiffs claim that, to the contrary, Defendants have undertaken a flawed assessment process that has predetermined class members' ability to succeed in a CILA.  (*Id.* ¶¶ 60–62, 66–74).  For example, Plaintiffs allege that they have received paperwork for their approval where their "choice" has been preselected to authorize community living for their wards.  (*Id.* ¶ 74.)  In addition, Plaintiffs allege that the class members are either unlikely or unable to obtain care at a private ICF-DD facility.  (*Id.*)  Accordingly, Plaintiffs and their wards have little choice but to move to a CILA.  (*See id.* ¶ 73 (alleging that Defendants have indicated they will choose community placements for residents over guardian objections).)  In addition, Plaintiffs have been informed that, if the CILA placements fail, former Murray and Jacksonville residents may need to seek services in other states.  (*Id.* ¶ 74.)

Plaintiffs contend that Defendants' conduct—particularly implementation of the allegedly rigged assessment and transfer process—discriminates against the class members on the basis of their disabilities in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, denies them equal protection, and deprives them of choice as required by the Medicaid Act.  They seek injunctive relief preventing the assessment and transfer of Murray residents, the closure of Murray, and appointment of a monitor.  Defendants raise a number of arguments in their motion to dismiss, which we address below.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to test the sufficiency of the complaint, not to decide the merits of the case.  *Gibson v. City of Chi.*, 910

F.2d 1510, 1520 (7th Cir. 1990). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks enough facts "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

Although a facially plausible complaint need not give "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964.

## ANALYSIS

### I. ISSUES PREVIOUSLY ADDRESSED

We begin our analysis by briefly mentioning two questions previously resolved. First, in their motion, Defendants reiterate their request for dismissal of Plaintiffs' claims for lack of subject matter jurisdiction. (Mem. at 5–6.) Defendants contend that Plaintiffs lack standing and that their claims are not ripe, because their alleged injuries are entirely speculative. (*Id.*; Reply

at 4–6.)  As Defendants concede, we previously rejected these arguments in our June 20, 2013

opinion.  (Dkt. No. 98 at 3–8; *see also* 6/28/13 Op. (Dkt. No. 112) at 5–7.)  Although Defendants

wish to preserve these arguments for appeal, we need not revisit them.

Second, our June 20, 2013 opinion also essentially disposed of Count III of the

complaint, which alleged a violation of the principles established in *Olmstead v. L.C. ex rel.*

*Zimring*, 527 U.S. 581, 587, 597, 601–07, 119 S. Ct. 2276, 2181, 2185, 2187–90 (1999).  In

*Olmstead*, the Supreme Court held that Title II of the ADA requires states to provide

community-based treatment for disabled persons, as opposed to institutionalization, under

specified circumstances.  In so holding, the Supreme Court explained that "[u]njustified isolation

. . . is properly regarded as discrimination based on disability."  *Id.* at 597, 119 S. Ct. at 2187.

As explained in our opinion, however, the putative class members here do not fall within

*Olmstead*'s purview.  *Id.* at 602–07, 119 S. Ct. at 2187–90 (holding that a state's duty arises only

where eligible disabled individuals "do not oppose such treatment").  As such, Count III is

untenable.

## II.     GOVERNOR QUINN AND DHS AS PARTIES

We turn now to the more substantive arguments raised by Defendants' motion.

Defendants claim that Governor Quinn is not a proper party to this lawsuit and that DHS cannot

be sued with respect to Counts IV and V.  (Mem. at 3–5; Reply at 3–4.)  We agree.

Pursuant to the Eleventh Amendment, the Supreme Court "has consistently held that an

unconsenting state is immune from suits brought in federal courts by her own citizens."

*Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355 (1974); *see Peirick v. Ind.*

*Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694–96 (7th Cir. 2007);

*Ameritech Corp. v. McCann*, 297 F.3d 582, 585–86 (7th Cir. 2002). "State agencies and officials sued in their official capacities are 'the state' for Eleventh Amendment purposes." *Olison v. Ryan*, No. 99 C 4384, 2000 WL 1263597, at *4 (N.D. Ill. Sept. 5, 2000) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)); *see Heabler v. Madigan*, No. 12 C 6193, 2013 WL 5405679, at *3 (N.D. Ill. Sept. 24, 2013); *Spain v. Elgin Mental Health Ctr.*, No. 10 C 1065, 2011 WL 1485285, at *4 (N.D. Ill. Apr. 18, 2011). There are three exceptions to the Eleventh Amendment's bar, which arise where: (1) a state has waived its immunity and consented to suit in federal court; (2) Congress has abrogated state immunity through a valid exercise of its authority; or (3) a plaintiff seeks only prospective injunctive relief from appropriate state officials for allegedly ongoing violations of federal law, pursuant to *Ex Parte Young*, 209 U.S. 123, 157–60, 28 S. Ct. 441, 453–55 (1908). *Ind. Protection & Advocacy Servs. v. Ind. Family & Social Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010); *Cullen v. Ill. Dep't of Human Servs.*, No. 12 C 1032, 2012 WL 1965384, at *3 (C.D. Ill. May 31, 2012); *Spain*, 2011 WL 1485285, at *4.

As Plaintiffs concede,[5] DHS is thus immune from suit for Counts IV and V, both asserted via § 1983, because it is a state agency. It is well-recognized that state agencies may not be sued under § 1983 because of the Eleventh Amendment and because states cannot be considered "persons" subject to suit under § 1983. *Wynn v. Ill. Dep't of Human Servs.*, No. 11 C 3663, 2012 WL 2992132, at *2–3 (N.D. Ill. July 16, 2012); *Cullen*, 2012 WL 1965384, at *4; *Spain*, 2011 WL 1485285, at *4. We thus grant Defendants' motion with respect to Counts IV and V as

---

[5] In their response, Plaintiffs acknowledge that "[t]echnically, the DHS Defendants are correct." (Resp. at 2.)

against DHS.  Pursuant to *Ex Parte Young*,[6] however, these claims remain pending against two individual state officials, Michelle R.B. Saddler and Kevin Casey, whom Plaintiffs named as defendants in their official capacities.  209 U.S. 123 at 157–60, 28 S. Ct. at 453–55; *Ind. Protection & Advocacy Servs.*, 603 F.3d at 371, 374; *Wynn*, 2012 WL 2992132, at *3; *Cullen*, 2012 WL 1965384, at *4.

Governor Quinn, on the other hand, is not a proper defendant for any of Plaintiffs' claims. As the Supreme Court explained in *Ex Parte Young*:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

209 U.S. 123 at 157, 28 S. Ct. at 453; *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006); *Weinstein v. Edgar*, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993).  Although the source of an official's authority is not material, a state official cannot be sued for prospective injunctive relief unless he or she has some connection to the enforcement or implementation of the particular law or conduct at issue.  *Ex Parte Young*, 209 U.S. 123 at 157, 28 S. Ct. at 453; *Fitts v. McGhee*, 172 U.S. 516, 529–30, 19 S. Ct. 269, 274 (1899); *Entm't Software Ass'n*, 469 F.3d at 644–45; *Weinstein*, 826 F. Supp. at 1166–67.

Here, Plaintiffs allege that Governor Quinn, as the chief executive of the State, is "responsible for directing, supervising and controlling the executive departments of state government."  (Compl. ¶ 37.)  He is "ultimately responsible for ensuring that Illinois operates its long-term care system for people with disabilities in conformance with federal and state laws." (*Id.*)  They further allege that Governor Quinn signed legislation that included a $1.6 billion cut

---

[6] Neither of the other Eleventh Amendment exceptions apply here.

to Medicaid, "endangering . . . the State's residents, and in particular, individuals with severe and profound developmental disabilities." (*Id.* ¶ 53.) Plaintiffs argue that Governor Quinn is a proper party because the actions at issue in the lawsuit "are taken at the behest of the Governor's office." (Resp. at 4.)

Consistent with precedent in this circuit, we hold that these allegations are insufficient to maintain an action against Governor Quinn. *Hearne v. Bd. of Educ. of City of Chi.*, 185 F.3d 770, 776–77 (7th Cir. 1999); *Union Benefica Mexicana v. Indiana*, No. 11 C 482, 2013 WL 4088690, at *6 (N.D. Ind. Aug. 13, 2013); *Sweeney v. Daniels*, No. 12 C 81, 2013 WL 209047, at *3 (N.D. Ind. Jan. 17, 2013); *Crosby v. Blagojevich*, No.07 C 6235, 2008 WL 5111172, at *2 (N.D. Ill. Dec. 4, 2008); *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 916–17 (E.D. Wis. Mar. 25, 2002); *Olison*, 2000 WL 1263597, at *4; *Weinstein*, 826 F. Supp. at 1167. A theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment. *Deida*, 192 F. Supp. 2d at 917 (holding that the governor's "general duty to enforce the laws" was not a sufficient connection); *Olison*, 2000 WL 1263597, at *4 (same); *see also Crosby*, 2008 WL 5111172, at *2 (dismissing governor who had no role in implementation or enforcement of a bill, nor the authority to nullify or amend it). Plaintiffs do not allege that Governor Quinn has any actual authority to enforce, curtail, or otherwise alter the assessment and transfer process at the SODCs. To the contrary, that process is coordinated by DHS, per its statutory mandate. (Mem. at 4; *see* Compl. ¶ 36 (alleging that DHS is the agency organized by law to provide services to the disabled and is implementing the planned SODC closures.) As the Seventh Circuit noted in *Hearne*, "the plaintiffs have not and

-8-

could not ask anything of the governor that could conceivably help their cause."[7]  185 F.3d at

777.  Accordingly, Governor Quinn is dismissed from this action because he lacks the requisite

connection to the allegedly unlawful conduct.

## III.  EQUAL PROTECTION CLAIM

In Count IV, Plaintiffs allege that Defendants' implementation of the Murray and

Jacksonville closures violates the Equal Protection Clause of the Fourteenth Amendment in

violation of 42 U.S.C. § 1983.  (Compl. ¶ 86.)  To state an equal protection claim, Plaintiffs must

allege that Defendants: (1) "treated [them] differently from others who were similarly situated,

(2) intentionally treated [them] differently because of [their] membership in the class to which

[they] belonged (i.e., [developmentally disabled]), and (3) because [the disabled] do not enjoy

any heightened protection under the Constitution, . . . that the discriminatory intent was not

rationally related to a legitimate state interest."  *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946,

950–51 (7th Cir. 2002); *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 442,

105 S. Ct. 3249, 3255–56 (1985); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1037–38 (N.D.

Ill. 2003); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367–68, 121 S. Ct.

955, 964 (2001) (confirming that the holding in *Cleburne* applies to the disabled such that state

action is subject to rational basis review only); *Doe v. Bd. of Trustees of Univ. of Ill.*, 429 F.

Supp. 2d 930, 943 (N.D. Ill. 2006).  Here, Plaintiffs claim that Defendants' forced transfer of the

class members to CILAs, without ensuring that medically necessary services will be available,

deprives disabled residents of their right to receive equal medical services.  (*Id.* ¶¶ 86–89.)  They

_____

[7] The Seventh Circuit added that "it is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system."  185 F.3d at 777.

allege that Defendants are deliberately treating them differently than others who receive medical services from and through the State. (*Id.* ¶ 87.)

Defendants argue that the equal protection claim must fail, however, because they have articulated a rational basis for their decisions to close the SODCs at issue and to transfer residents to CILAs. (Mem. at 19–20; Reply at 13–15.) As Defendants point out, "the rational-basis test is a lenient standard" such that "the government's action simply cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose." *Smith v. City of Chi.*, 457 F.3d 643, 652 (7th Cir. 2006); *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013); *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546–47 (7th Cir. 2008). Nonetheless, "the rational basis standard . . . cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard." *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1999); *Flying J Inc.*, 549 F.3d at 546 (also acknowledging this "perplexing situation" that arises when considering government rationales at the 12(b)(6) stage). To reconcile these standards, "the solution is to 'take as true all of the complaint's allegations and reasonable inferences that follow, [and then] apply the resulting 'facts' in light of the deferential rational basis standard." *Flying J Inc.*, 549 F.3d at 546 (quoting *Wroblewski*, 965 F.2d at 460). A plaintiff must foresee this dilemma and must "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski*, 965 F.2d at 460; *D.B. ex rel. Kurtis B.*, 725 F.3d at 686.

With these principles in mind, we conclude that Plaintiffs' equal protection claim withstands the present motion. Although Defendants identify two reasons underlying their decisions concerning the SODCs, those explanations do not yet entitle them to a presumption of

rationality, particularly with respect to the transfer decisions. First, Defendants contend that the decisions to close Murray and Jacksonville and to transfer their residents elsewhere are based solely on budgetary concerns. Plaintiffs readily admit that "cuts in the State's budget may require fiscal austerity" and that the decision to close SODCs represents "a means to contend with the State's $13 billion deficit."[8] (Compl. ¶¶ 7, 52.) We cannot draw from the complaint, however, any reasonable inference supporting Defendants' further claim that moving residents to CILAs is less costly than some other alternative. Plaintiffs do not concede this discrete point, and Defendants have not explained how requiring all of the class member residents to transfer to group homes will save money. In reaching this conclusion we do not comment on the merits of this argument. At this stage, without factual support in the complaint or otherwise before us, we simply decline to hold that Defendants have established cost as the legitimate governmental rationale for mandating the transfer of Murray and Jacksonville residents to CILAs.

Defendants' second explanation for their decision to move the developmentally disabled class members out of SODCs rests on the Supreme Court's decision in *Olmstead*. 527 U.S. at 587, 597, 601–07, 119 S. Ct. at 2181, 2185, 2187–90. The *Olmstead* court held that Title II of the ADA requires states to provide community-based treatment for disabled persons, where the following three elements are met:

> the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 587, 119 S. Ct. at 2181. In its opinion, however, the court also emphasized that "nothing in

---

[8] Plaintiffs have also acknowledged generally that they cannot require the State to maintain any particular facility.

the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601–02, 119 S. Ct. at 2187. "Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 602, 119 S. Ct. at 2188. The court acknowledged that integrated placement might never be appropriate for some individuals and, moreover, that the ADA should not be read to require "States to phase out institutions, placing patients in need of close care at risk." *Id.* at 605, 119 S. Ct. at 2189.

In light of the Supreme Court's admonitions, Defendants' reliance on *Olmstead* here is misplaced. Surely *Olmstead* requires Defendants to provide community-based treatment when the three prerequisites, including patient consent, are satisfied. But Defendants' efforts to comply with *Olmstead* do not justify the alleged forcing of CILA placements on class members and their guardians who vigorously oppose such placements. While Defendants may wish to encourage community-based treatment for all who qualify and consent pursuant to *Olmstead*, Plaintiffs' complaint alleges far more draconian conduct. Plaintiffs claim that Defendants have predetermined group placements for the class members regardless of their needs, preselected guardian "choice" on authorization forms, threatened to evaluate and transfer class members over guardian objections, and denied guardian attempts to secure alternate SODC placements in lieu of community placements. (Compl. ¶¶ 70–74.) Certain individual Plaintiffs also allege that Defendants have informed them that, if they persist with their opposition to CILA placements, their wards will be evicted and, if other arrangements are not found by the guardians, Defendants will select housing for their wards regardless of consent. (*Id.* ¶¶ 25–27; *see also id.* ¶¶ 31–34.) Although *Olmstead* does not entitle Plaintiffs to any affirmative relief, it does not require—and

in fact explicitly discourages—Defendants' alleged conduct. As a result, Defendants cannot

claim that their duty to comply with *Olmstead* is a rational basis for the alleged decision to force

all of the class members into CILAs despite individual needs and guardian objections.

We thus deny the motion as to the equal protection claim. In addition, we will consider

this claim when evaluating the merits of the preliminary injunction motion.

## IV. TITLE II AND REHABILITATION ACT CLAIMS

Counts I and II of the complaint assert discrimination claims under Title II of the ADA

and § 504 of the Rehabilitation Act. (Compl. ¶¶ 63–78.) As we have previously indicated, these

claims are construed identically. *Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004);

*Washington v. Indiana High Sch. Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999) (noting that the

two statutes are coextensive). To state a claim of discrimination under these statutes,[9] Plaintiffs

must allege that: (1) they are qualified individuals with disabilities; (2) they have been denied

"the benefits of the services, programs, or activities of a public entity;" and (3) that denial or

exclusion was "by reason of such disability."[10] 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a);

*Brad K. v. Bd. of Educ. of City of Chi.*, 787 F. Supp. 2d 734, 746–47 (N.D. Ill. 2011); *Phipps v.*

*Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 913 (N.D. Ill. 2009).

Defendants contend that Plaintiffs have failed to state a discrimination claim, in part

because they failed to identify a theory of relief. In their argument, Defendants state that we

---

[9] The parties do not dispute that Defendants are a public entity, as necessary for an ADA claim, or that they received federal funding assistance, as necessary for a Rehabilitation Act claim.

[10] The third element—the "by reason of disability" language—ultimately requires a showing of "but for" causation. *Wisconsin Comm' Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006); *Washington*, 181 F.3d at 849.

previously dismissed Plaintiffs' discrimination claims and instructed them to limit their claims to

three theories. (Mem. at 6–7.) Defendants blatantly mischaracterize our June 20, 2013 opinion,

which did not dismiss Plaintiffs' ADA or Rehabilitation Act claims. (*See* 6/20/13 Op. at 9–10.)

In that opinion we explained that, although Plaintiffs could not advance an *Olmstead* claim, their

discrimination claims could rest on any one or more of three evidentiary approaches. (*Id.*) As

discussed, "discrimination under both acts may be established by evidence that (1) the defendant

intentionally discriminated on the basis of disability, (2) the defendant refused to provide a

reasonable accommodation, or (3) the defendant's rule disproportionally impacts disabled

people." *Washington*, 181 F.3d at 847; *Wisconsin Comm' Servs.,* 465 F.3d at 753; *see*

*Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 937 (N.D. Ind. 2009). We thus instructed

the parties to tailor their presentations to these available theories for purposes of the preliminary

injunction hearing, which will require us to assess Plaintiffs' likelihood of success on the

merits.[11] Contrary to Defendants' position, however, these three evidentiary approaches are not

pleading requirements, but methods of proof. Plaintiffs could have explicitly detailed their

evidentiary theories in their complaint, but Rule 8 does not require them to do so. Fed. R. Civ.

P.8(a) (requiring plaintiff to include a "short and plain statement of the claim" showing a right to

relief); *see also Carothers v. Office of the Transitional Adm'r*, No. 12 C 6620, 2013 WL

3388876, at *1 (N.D. Ill. July 8, 2013) (noting that a "plaintiff need not plead legal theories"

because "it is the facts that count").

    We turn then to evaluate the sufficiency of Plaintiffs' allegations. The complaint

includes allegations about the severity of the developmental disabilities suffered by the putative

---

[11] According to their brief filed August 7, 2013, (Dkt. No. 159), Plaintiffs will be
pursuing all three evidentiary approaches.

class members. (*See, e.g.*, Compl. ¶¶ 25–27, 68, 70–71 & Ex. B.) Plaintiffs allege that many of

the class members are non-verbal, immobile, and lack the cognitive skills to live semi-

independently. (*Id.* ¶¶ 68, 71.) Plaintiffs describe how they and their wards are being deprived

of any meaningful choice for future placements with adequate safety-net services when Murray

closes. (*Id.* ¶¶ 65–66, 72–74.) In a nutshell, Plaintiffs allege that Defendants are eliminating

current SODC services due to the budget cut but, in lieu thereof, are offering only CILA

placement for SODC residents who must relocate, who cannot secure treatment at a private ICF-

DD,[12] and who will not receive the same level of services at CILAs that they currently receive.

(*Id.* ¶¶ 66–74.) To effectuate these forced transfers out of SODCs, Defendants have

implemented an assessment process that predetermines the appropriateness of community

settings for SODC residents and overrides guardian wishes. (*Id.* ¶¶ 60–62, 66–74.) Plaintiffs

further complain that, underlying this situation, Defendants have intentionally targeted

developmentally disabled class members for greater cuts in funding and in effective, necessary

services than those cuts imposed on individuals with other types of disabilities. (*Id.* ¶¶ 58, 65;

*see also id.* ¶¶ 86–89.) The complaint also alleges in detail how CILAs are woefully inadequate

for class members' needs, threatening their health and safety. (*Id.* ¶¶ 3, 6–7, 25–27, 31–34,

57–61.)

We conclude that these allegations plausibly state discrimination claims under Title II

and the Rehabilitation Act. The complaint alleges that the class members at issue here are

disabled and that Defendants' conduct has denied them (or if not enjoined will deny them) the

level of services they have received at SODCs. Plaintiffs claim that these decisions to close

---

[12] Plaintiffs relatedly allege that Defendants are not helping them obtain ICF-DD
placements. (Compl. ¶ 74.)

Murray and Jacksonville and to force the class members to relocate to CILAs are discriminatory because other disabled individuals who receive services from or through the State have not been subjected to such severe cuts in funding or benefits. These allegations "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *McCauley v. City of Chi.*, 671 F.3d 611, 616–17 (7th Cir. 2011); *Bissessur v. Ind. Univ. Bd. of Trustees*, 581 F.3d 599, 602–03 (7th Cir. 2009); *see Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614, 616 (7th Cir. 2011) ("At the pleading stage, the test is not whether the plaintiff will ultimately prevail, but rather whether the pleading is sufficient to cross this minimal threshold.").

Before moving on, we briefly address Defendants' challenge to Plaintiffs' allegations of intra-class discrimination. (Mem. at 7, 12, 14; Reply at 6–7.) Defendants contend that Plaintiffs cannot make out such a claim because the class alleged in the complaint includes all SODC residents. Plaintiffs thus have not alleged that they are being treated differently than another group on the basis of their disability, as all members of the class have the same disabilities. This argument fails, however, because Plaintiffs' definition of the putative class is wholly unrelated to the intra-class discrimination claim. Plaintiffs' intra-class claim seeks to compare Defendants' treatment of the class members to Defendants' treatment of individuals with other types or levels of disabilities. (Compl. ¶ 65.)

The Seventh Circuit recently confirmed that discrimination claims are cognizable under Title II even when comparing members of the same protected class, as alleged here. *Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874–75 (7th Cir. 2013). The plaintiffs in *Amundson*—a group of developmentally disabled individuals—argued that

-16-

Wisconsin's cut to their subsidies would require them to move from their group homes to institutions.  Although the *Olmstead* argument was not ripe, the court in *Amundson* entertained plaintiffs' contention that the state was treating them worse than other types of disabled people because of the steep funding cut.  *Id.*  The Seventh Circuit explained that "[i]f Wisconsin buys the best available care for persons with visual impairments, but pays only for mediocre care for the developmentally disabled, then plaintiffs have a theory of discrimination even though all of them remain in group homes."  *Id.* at 874; *see also Nelson v. Milwaukee Cty.*, No. 04 C 193, 2006 WL 290510, at *5 (E.D. Wis. Feb. 7, 2006) ("[T]o the extent that plaintiffs allege that defendants are treating them worse than persons with less severe disabilities, they may proceed as such claims allege differential treatment by reason of disability.").  Although Plaintiffs have yet to identify another subset of disabled individuals for comparison purposes, we cannot rule out the possibility that they can and will do so as described in *Amundson*.[13]  At this stage, "we give the plaintiff the benefit of the imagination, so long as the hypotheses are consistent with the complaint."  *Bissessur v. Ind. Univ. Bd. of Trustees*, 581 F.3d 599, 602–03 (7th Cir. 2009) (internal quotation omitted); *Mehta*, 432 F. App'x at 616.  We conclude that Plaintiffs are "entitled to take the next step in this litigation" and deny the motion as to Counts I and II. *Swanson*, 614 F.3d at 407; *Mehta*, 432 F. App'x at 616 ("We ask whether the story could have happened, not whether it did.").

## V.      MEDICAID ACT CLAIM

---

[13] In rejecting the discrimination claim asserted in *Amundson*, the Seventh Circuit pointed out that, despite the significant cut in the subsidy, plaintiffs did "not contend that they are now treated *worse* than some other set of disabled persons."  721 F.3d at 875.  To prove this particular theory under *Amundson*, Plaintiffs must establish facts about a comparison group or "any standard by which 'worse treatment' could be identified."  *Id.* at 874–75.

Finally, we consider a threshold legal question essential to Plaintiffs' Medicaid claim, alleged in Count V. Under the Medicaid "HCBS waiver program," Congress authorizes funding for "states to give individuals who would otherwise be eligible to receive Medicaid benefits in a more traditional, long-term institution the option of receiving care in their home or in community-based residences." *Ball v. Rodgers*, 492 F.3d 1094, 1098 (9th Cir. 2007). To qualify for the waiver program, states must provide "certain 'assurances' to the Secretary of Health and Human Services." *Id.* (citing §§ 1396n(c)(2), (d)(2)). Section 1396n(c)(2)©, known as the free choice provision, requires one such assurance:

> [S]uch individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded.

42 U.S.C. § 1396n(c)(2)©. Plaintiffs allege that the class members qualify for and are currently receiving services covered by this provision. (Compl. ¶¶ 1, 59–62, 98.) As such, where options for treatment are available in Illinois under the HCBS waiver program, Plaintiffs and their wards are entitled to be "informed of the feasible alternatives" and to choose the type of facility where they receive services. 42 U.S.C. § 1396n(c)(2)©. As the Seventh Circuit has stated, this subsection does not mandate that Defendants offer a particular option or operate a particular facility but "just requires the provision of information about options that *are* available." *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 459 (7th Cir. 2007).

Defendants contend, however, that Count V must be dismissed because Plaintiffs have no private right of action to sue for any alleged violation of § 1396n(c)(2)©. The parties agree that the Medicaid Act itself does not authorize individual actions under § 1396n(c)(2)©. (Resp. at

-18-

15; Reply at 11.)  They vigorously dispute, however, whether 42 U.S.C. § 1983 arms Plaintiffs

with an implied enforcement mechanism.  Defendants argue that § 1396n(c)(2)© is not

redressable via § 1983 because Congress did not intend to create a personal federal right.  (Mem.

at 16–19; Reply at 11–13.)

Both parties recognize that two Supreme Court decisions guide the analysis of this

question:  *Gonzaga University v. Doe*, 536 U.S. 273, 122 S. Ct. 2268 (2002) and *Blessing v.

Freestone*, 520 U.S. 329, 117 S. Ct. 1353 (1997).  *Blessing* set out three factors to consider when

evaluating "whether a particular statutory provision gives rise to a federal right."  520 U.S. at

340, 117 S. Ct. at 1359.  A plaintiff must show that: (1) "Congress . . . intended that the

provision in question benefit the plaintiff;" (2) "the right assertedly protected by the statute is not

so vague and amorphous that its enforcement would strain judicial competence;" and (3) the

statute "unambiguously impose[s] a binding obligation on the States."  *Id.* at 340–41, 117 S. Ct.

at 1359 (internal quotation omitted).  In *Gonzaga University*, the Supreme Court clarified the

first element of the *Blessing* test, holding that "it is *rights*, not the broader or vaguer 'benefits' or

'interests,' that may be enforced" under § 1983.  536 U.S. at 283, 112 S. Ct. at 2275.

Although there are older cases coming down on both sides of this question, the leading

post-*Gonzaga University* authority holds that § 1396n(c)(2)© is enforceable via § 1983.  In *Ball

v. Rodgers*, the Ninth Circuit addressed this precise issue in detail.  The opinion includes a

careful, extensive analysis and application of the *Blessing* and *Gonzaga University* tests.  492

F.3d at 1103–17.  The Ninth Circuit ultimately concluded that "Medicaid beneficiaries enjoy

'unambiguously conferred' individual rights under §§ 1396n(c)(2)© and (d)(2)© and that those

rights can be properly enforced through a § 1983 cause of action."  *Id.* at 1117 (remanding to the

district court for further consideration of the free choice claims and injunction terms). Although Defendants ask us to reject *Ball*, we see no reason to do so.[14]  To the contrary, and to avoid gilding the lily, we hereby adopt the Ninth Circuit's persuasive reasoning and well-supported holding in *Ball*.

Having concluded that Plaintiffs have a private right of action under § 1983 for their § 1396n(c)(2)© claim, we evaluate the sufficiency of those allegations.[15]  Plaintiffs allege that Defendants have not informed them of feasible alternatives that remain available in Illinois under the waiver.  For example, Plaintiffs allege that Defendants have told them "that they cannot choose another SODC in lieu of transition to the community setting."  (Compl. ¶ 74.) Defendants also have not been forthcoming with information or assistance about private ICF-DD housing alternatives.  (*Id.*)  Plaintiffs allege that Defendants have deprived them of information and of choice, despite § 1396n(c)(2)(C)'s mandate.  (*Id.* ¶¶ 62, 74, 97–98.)  Count V thus adequately sets forth a claim for violations of Medicaid's free choice provision.

## VI.    OUTSTANDING ISSUES

In preparation for the preliminary injunction hearing, and given our rulings today, we

---

[14] There are few cases on this question, and no Seventh Circuit authority on point.  To date, no other federal court to take up the matter has rejected the holding in *Ball*.  *See Dykes v. Dudek*, No. 11 C 116, 2011 WL 3860022, at *3 (N.D. Fla. Aug. 30, 2011); *Zatuchni v. Richman*, No. 07 C 4600, 2008 WL 3408554, at *10–11 (E.D. Pa. Aug.12, 2008); *see also Wood v. Tompkins*, 33 F.3d 600, 612 (6th Cir. 1994) (finding a § 1983 private right of action under § 1396n(c)(2)(C), though prior to the *Gonzaga University* decision).

[15] Defendants argue that Plaintiffs cannot sue for violations of state regulatory laws relating to Medicaid, as alleged in Count V.  (Mem. at 18; Reply at 13; *see* Compl. ¶¶ 96–98.) Plaintiffs did not respond to this argument.  In addition, Plaintiffs have previously stated that the lawsuit involves only vindication of federal rights.  (Reply ISO Prel. Inj. Mot. (Dkt. No. 43) at 14.)  Accordingly, we find that Plaintiffs have abandoned this claim as it concerns alleged violations of state law.

order the parties to address several issues by written submission to be filed no later than November 15, 2013. First, the parties shall address whether the upcoming preliminary injunction should also constitute a hearing for permanent injunctive relief. Second, the parties shall inform us of any specific objections to our consideration of the equal protection claim at the hearing. Third, the parties shall submit proposed language for the terms of a preliminary injunction, should Plaintiffs prevail at the hearing on the Medicaid Act claim.

## CONCLUSION

For the reasons set forth above, Defendants' motion (Dkt. No. 162) is granted in part and denied in part. We dismiss Counts IV and V as to Defendant DHS, and we dismiss all claims against Governor Quinn. Count III is dismissed entirely, and Count V is dismissed to the extent it alleged violations of state regulatory laws relating to Medicaid. The motion is denied in all other respects.

The parties shall file the information requested above no later than November 15, 2013.

We also advise the parties that we will allow each side thirty minutes for summation at the conclusion of the hearing. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: October 8, 2013

-21-