# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS LEAGUE OF ADVOCATES FOR THE DEVELOPMENTALLY, DISABLED, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 13 C 1300 |
| v. | ) ) | Judge Marvin E. Aspen |
| ILLINOIS DEPARTMENT OF HUMAN SERVICES, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

Plaintiffs in this action have challenged Defendants' decisions to close a state-operated institution for the developmentally disabled and to assess its residents for potential transfers into community living arrangements. Plaintiffs contend that this conduct constitutes disability discrimination in violation of federal law, denies Plaintiffs and the purported class members equal protection, and deprives them of choice as required by the Medicaid Act.

In early January 2014, a three-day preliminary injunction hearing in this matter was conducted. The parties have since submitted their post-hearing briefs, as well as their proposed findings of fact and conclusions of law. For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is denied.

# FINDINGS OF FACT[1]

Pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65, we begin with a recitation of the facts pertinent to our analysis. Fed. R. Civ. P. 52(a)(2), 65. We rely on the parties' Stipulation of Facts (Dkt. No. 348), their proposed findings, the witnesses' written direct testimony submitted prior to the hearing, the transcripts of hearing testimony, the parties' exhibits, and, where necessary, our assessment of witness credibility. We also consider the parties' pre- and post-hearing briefs (including supplemental materials), and we bear in mind our prior evidentiary rulings. (*See* 12/5/13 Op. (Dkt. No. 321) (resolving motions in limine).) In large part, the critical facts are undisputed.

## I.     THE PARTIES AND RESIDENTS OF MURRAY

Plaintiffs include the guardians for several individuals who reside at the Warren G. Murray Developmental Center ("Murray"). (Stip. ¶ 1.) Murray is a state operated developmental center ("SODC"), a residential facility that provides housing and a range of services (known as "ICF-MR" services) to individuals with developmental disabilities, particularly those with severe and/or behavioral needs. (*Id.* ¶ 8.) Murray is located in Centralia and is one of seven SODCs operated by the State of Illinois. (*Id.* ¶ 9.) As of August 31, 2013, Murray was home to 233 residents, some of whom have lived there for decades. (*Id.* ¶ 10; *see also* Rule 30(b)(6) Decl. of Rita Winkeler ¶ 21 & Ex. (letters filed under seal) (Dkt. Nos. 239-1, 240).)

Many of the Murray residents are nonverbal and medically fragile. (Winkeler 30(b)(6) Decl. ¶ 21 & Ex.; *see also* Decl. of Rita Winkeler ¶¶ 4–5 (Dkt. No. 241-1); 9/22/13 Decl. of

---

[1] We assume familiarity with the extensive procedural background of this case.

William Henson ¶ 4 (Dkt. No. 241-10); 4/12/13 Decl. of Marsha Holzhauer ¶ 3 (Dkt. No. 241-9); 9/23/13 Decl. of Dr. Karen Kelly ¶¶ 5–6 (Dkt. No. 241-3); Rule 30(b)(6) Decl. of Rita Burke ¶¶ 10–12 (Dkt. No. 314-1); 9/21/13 Decl. of Janice Kerst ¶ 3 (Dkt. No. 241-5); 4/13/13 Decl. of Denise Schoppet ¶ 2 (Dkt. No. 241-8); 6/23/13 Decl. of Lori Demijan ¶¶ 2–5 (Dkt. No. 241-17).) As of August 31, 2013, eighty-four percent (84%) of Murray residents had severe or profound mental retardation range. (Stip. ¶ 10.) Sixty-eight percent (68%) of the residents had a behavior intervention program, often requiring higher levels of staff supervision. (*Id.* (internal quotation omitted).) Some of the specific conditions found in the Murray population include mental illnesses, self-injurious and aggressive behaviors, elopement tendencies, seizures, autism, cerebral palsy, and pica disorder, which is characterized by an individual's efforts to ingest inedible objects. (Winkeler 30(b)(6) Decl. ¶ 21 & Ex.) These individuals often have the mentality of infants or toddlers, and they need help with the most basic functions of daily living, such as eating, toileting, bathing, and dressing. (Winkeler 30(b)(6) Decl. ¶ 21 & Ex.) Many thus require significant supervision to ensure their health and safety and, generally speaking, are extremely sensitive to any changes to their routines. (*Id.*)

In addition to several Murray guardians, the named Plaintiffs include, *inter alia*, two organizations: (1) the Murray Parents Association ("MPA"), which keeps guardians informed about and involved in events and issues concerning Murray; and (2) the Illinois League of Advocates for the Developmentally Disabled, which seeks to promote the welfare of people with developmental disabilities in the State of Illinois, particularly those living in residential placements. (Stip. ¶¶ 2–3; Winkeler 30(b)(6) Decl. ¶ 2; Burke 30(b)(6) Decl. ¶ 1.) Plaintiffs seek to represent a class comprised of developmentally disabled individuals who, at any time

since January 1, 2011, currently reside or formerly resided at one of two SODCs—Murray and Jacksonville Developmental Center ("Jacksonville")—and who oppose transfer from their SODC home to a community integrated living arrangement ("CILA").[2]  (Compl. ¶¶ 1–4, 42–50, 58.)

Defendants include Michelle R.B. Saddler, the Secretary of the Illinois Department of Human Services ("DHS"), and Kevin Casey, the Director of the Division of Developmental Disabilities for DHS ("Division"), both of whom have been sued in their official capacities. Plaintiffs also sued Community Resource Alliance ("CR Alliance"), an organization owned and operated by Dr. Michael Mayer.  (Stip. ¶¶ 4–6.)  Community Resource Associates ("CR Associates"), owned and operated by Derrick Dufresne, has a contract to provide services for DHS but is not a party.  (*Id.* ¶ 7.)

## II.     THE DIVISION AND THE REBALANCING INITIATIVE

### A.     Services Offered by the Division

The seven Illinois SODCs currently serve approximately 1,800 residents.  (9/23/13 Decl. of Kevin Casey ¶ 7 (Dkt. No. 245-1).)  The SODCs constitute Intermediate Care Facilities for the Developmentally Disabled ("ICF/DDs").  (*Id.* ¶¶ 5, 7–8.)  The Division also administratively oversees about 300 private ICF/DDs, which also provide ICF-MR services.  (*Id.* ¶ 8.)  The Division additionally serves approximately 22,000 individuals in community-based settings, through the Medicaid Home and Community Based Waiver Program ("HCBS Waiver Program").  (*Id.*)  Under the HCBS Waiver Program, Congress authorizes funding for states to serve Medicaid eligible recipients in the community—recipients who would otherwise qualify for

---

[2] Plaintiffs have not moved for class certification.

institutional placement—so long as the average cost for community services does not exceed the average cost of institutional services. (*Id.* ¶¶ 8, 15.)

Pursuant to the HCBS Waiver Program, about 9,900 Illinois citizens live in CILAs, typically houses or apartments suitable for one to eight residents. (*Id.*) The majority of CILAs in Illinois are operated by community providers, who are licensed through the DHS Bureau of Accreditation, Licensing, and Certification ("Bureau"). (*Id.* ¶ 29.) The Bureau inspects CILA providers every three years, and the DHS Bureau of Quality Management also performs random visits and evaluations. (*Id.*) CILA residents are assigned a case manager from an independent case management agency ("PAS"), and the PAS agent must visit the resident at least four times a year. (*Id.*; *see also* 1/7/14 Hr'g Tr. (Freeman) at 143.) When an individual transfers from an SODC to a CILA, they are also monitored by the DHS Bureau of Transition Services ("BTS"). (Casey Decl. ¶ 31.) BTS conducts periodic visits to the service providers throughout an individual's community placement. (*Id.*)

As for CILA caregivers, DHS requires providers to conduct background checks on potential employees. (*Id.* ¶ 29.) All CILA employees are required to complete 40 hours of classroom instruction, as well as 80 hours of on-the-job training. (*Id.*)

In addition to the roughly 25,000 citizens served by the Division, an estimated 23,000 people with developmental disabilities in Illinois are on a waiting list to receive services, of whom 6,000 are considered to be in emergency situations. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 29.) The Division lacks funding to offer services to these individuals. (*Id.*)

## B. The Rebalancing Initiative

In February 2012, Illinois Governor Quinn introduced his Rebalancing Initiative ("the Initiative"), which aims to restructure the system so that it is less reliant on ICF/DDs and more reliant on integrated, community settings. (Stip. ¶ 14; Casey Decl. ¶ 9.) The initial goal of the Initiative was to reduce the State's SODC population by 600 residents by the end of the 2014 fiscal year. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 58–59.) Both Jacksonville and Murray were slated to close pursuant to the Initiative. (Stip. ¶ 14.)

According to Casey's undisputed testimony, the closing of such congregate facilities reflects the national trend. (Casey Decl. ¶ 7.) Eleven states have eliminated SODCs entirely. (*Id.*) Illinois serves more developmentally disabled individuals in institutions than any other state, except for Texas and California. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 9–10.) The Initiative seeks to redirect the system towards community-based services for the developmentally disabled, the mentally ill, and individuals receiving services in nursing homes. (*Id.*)

This move away from institutionalization has several underlying bases. First, community programs are considered the best practice standard by the majority of professionals in the field. (*Id.* at 11–19; Casey Decl. ¶ 11.) Community programs have been developing for at least 50 years and are not a fad. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 19; *see also* 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 51, 58–59, 62.) Casey testified, based on both his experience and the professional research, that overall "people with intellectual disabilities do better in community programs." (1/8/14 2 p.m. Hr'g Tr. (Casey) at 12; *id.* at 84–85; Casey Decl. ¶¶ 11–13.)

Second, community programs, on the whole, are less expensive than institutional placements. (Casey Decl. ¶¶ 14–17; 1/8/14 2 p.m. Hr'g Tr. (Casey) at 26–29 ("Most of the

research and my personal experience indicates that community programs are less expensive, frankly, than institutional programs.").) Even if certain community placements exceed the average cost of institutional care—for example, where a more complicated plan is required to support an individual's needs—funding should be available in excess of the institutional rate because "the vast majority of community placements fall well under this average." (Casey Decl. ¶ 15; *see also* 1/8/14 2 p.m. Hr'g Tr. (Casey) at 27–29.) On the other hand, Plaintiff's expert, Greg Shaver, testified that it would not be cost-effective to develop community placements for some disabled individuals who are medically frail or pose particular behavioral challenges, including some Murray residents. (1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 37–41.) Although Casey could not guarantee that the State of Illinois would save money under the Initiative, he testified that he expects savings and that they "will use that money to serve people off of the community waiting list." (1/8/14 2 p.m. Hr'g Tr. (Casey) at 27 (further stating that "[i]f we don't save a dime, we won't save a dime"); *id*. at 84.)

Third, the trend away from institutional treatment of the developmentally disabled stems in part from the United States Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587, 597, 601–07, 119 S. Ct. 2276, 2181, 2185, 2187–90 (1999). In *Olmstead*, the Supreme Court held that Title II of the Americans with Disabilities Act ("ADA") requires states to provide community-based treatment for disabled persons, as opposed to institutionalization, under specified circumstances. In so holding, the Supreme Court explained that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597, 119 S. Ct. at 2187. Consistent with these principles, states including Illinois have taken steps to reduce the number of institutionalized disabled individuals by allowing them to live in a less restrictive

community setting.  (Casey Decl. ¶¶ 7, 13; 1/8/14 2 p.m. Hr'g Tr. (Casey) at 11–12 (noting a study that indicated a 90% reduction since the 1960s in the number of people served in institutional programs nationwide); *see also* 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 58–59 (discussing the decreased census at Murray over the last three decades, as well as his overall support for the closure of SODCs other than Murray).)  For the above reasons, the State seeks to implement a more progressive approach to the treatment of the developmentally disabled and serve more people with such disabilities in integrated, community settings.  (Casey Decl. ¶¶ 9–10.)

While Governor Quinn and DHS seek to reduce the State's reliance on institutional settings—and thus outspokenly prefer to place individuals in small community homes—Casey and others concede that "there may be some persons who are difficult to place in the community and can be more efficiently served by an ICF/DD level of care rather than a CILA, or for whom a guardian may prefer an ICF/DD level of care."  (Casey Decl. ¶ 13; *see id.* ¶ 12; *see also* 1/8/14 2 p.m. Hr'g Tr. (Casey) at 43 (admitting that not all people do better in the community); 1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 53 ("I believe that there will be people who will not be successful in the community."); 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 4–5 (testifying that he has concluded that at least one SODC resident he evaluated should not be placed in the community).)

### C.    The Closures of Jacksonville and Murray

The first SODC slated to close pursuant to the Initiative was Jacksonville, which closed on December 3, 2012.  (Stip. ¶ 16.)  Of the roughly 180 residents, 108 moved to community placements, almost all CILAs.  (Casey Decl. ¶ 32.)  Eighteen residents moved to private ICF/DDs, 53 transferred to other SODCs, and one was placed in a mental health center.  (*Id.*)

There is no evidence that Defendants transferred any Jacksonville residents to a community placement without guardian consent.[3]  (*See, e.g.*, *id.*; 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 29; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 27–28, 34.)

Murray was scheduled to close on October 31, 2013, though this litigation has delayed that process.  (Compl. ¶ 52; *see also* 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 13.)  As both parties have acknowledged, Plaintiffs are not entitled to care in, and cannot force the State to permanently maintain, any particular facility.  Accordingly, so long as the State decisionmakers intend to close Murray, it will close.

Some residents have already transitioned out of Murray in preparation for its planned closing.  For example, approximately four individuals have moved into a private ICF/DD from Murray.  (1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 36.)  Some other residents who have left Murray are wards of the Office of the Special Guardian ("OSG").  Two of these individuals will be moving to other SODCs.  (1/8/14 2 p.m. Hr'g Tr. (Starr) at 118–19.)  The OSG initially approved another twenty-four Murray residents to move to CILAs, but that decision has been challenged in state court, which has appointed a temporary guardian *ad litem* ("GAL"), Stewart Freeman, for these individuals.[4]  (Decl. of Stewart Freeman ¶¶ 5–9 (Dkt. No. 241-4); 1/7/14 Hr'g Tr. (Freeman) at 112–15.)  Although that dispute remains pending, there is no evidence to suggest

_____

[3] When Jacksonville closed, approximately thirteen people were moved to other SODCs without guardian input.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 65–66.)  In those instances, the families and guardians failed to respond to DHS's requests for direction.  (*Id.*)

[4] In light of questions raised about the OSG's conduct, the state court authorized Freeman to decide whether his clients should be transferred permanently to homes and/or institutions other than Murray.  (Freeman Decl. ¶ 5; *see also* 12/19/13 Op. (Dkt. No. 346) (providing more background on Freeman's role and resolving judicial notice motion).)

that Defendants removed the thirteen OSG wards currently living in CILAs from Murray without the OSG's initial consent. (1/7/14 Hr'g Tr. (Henson) at 48–49 (acknowledging that the OSG signed documentation to allow the transfers); *see also* 1/7/14 Hr'g Tr. (Freeman) at 135–38.)

Casey testified that he is not aware of any plans for DHS to close all of the State's SODCs. Governor Quinn announced an intention to close up to four SODCs, to reduce the census by 600 residents, but Casey has no knowledge of intended closures beyond Murray and Jacksonville. (Casey Decl. ¶ 27.)

## III.    The ACCT Process

### A.    Overview of the Process

DHS has begun planning for resident transfers given Murray's slated closure. In light of the goals of the Initiative, DHS advises and prefers that all guardians consider a CILA for their wards' next placement. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 23–25; Casey Decl. ¶¶ 23–25.) To that end, DHS contracted with CR Associates, who works with CR Alliance, to assess individuals for placement in the community.[5] (10/2/13 Am. Decl. of Derrick Dufresne ¶¶ 1, 7 (Dkt. No. 275-1); 9/23/13 Decl. of Dr. Michael Mayer ¶¶ 1 (Dkt. No. 245-2).) According to Casey, DHS retained CRA because Murray staff members would not have enough time to perform their regular duties as well as prepare transition plans for all of Murray's residents. (Casey Decl. ¶ 18; *see, e.g.*, 1/7/14 Hr'g Tr. (Henson) at 52–53 (agreeing that the Murray interdisciplinary ("ID") team, including two social workers, would otherwise be called on to

---

[5] As we understand it, CR Alliance completes the assessments of each resident for potential community placement, while CR Associates coordinates residential placements with DHS and the PAS agent after assessments have concluded. (Mayer Decl. ¶¶ 1, 12, 19; Dufresne Decl. ¶¶ 1, 7–8.) For the sake of simplicity, however, we will refer to these entities collectively as "CRA."

assist with transition decisions for each resident); Henson Decl. ¶ 2.)  The State pays CRA

approximately $180,000 per month under the contract, which began in 2012.  (1/9/14 9:30 a.m.

Hr'g Tr. (Doyle) at 18; *see* Casey Decl. ¶ 18 (stating the DHS has a $2 million contract with CR

Associates).)

DHS engages in a type of "person-centered planning," which they call the "ACCT

process," to evaluate each resident for future placements.  (Casey Decl. ¶¶ 18–19; Dufresne Decl.

¶ 7; Mayer Decl. ¶ 9.)  DHS retained CRA, and employed the ACCT process, to implement the

closure of Jacksonville.  (Dufresne Decl. ¶ 9; Mayer Decl. ¶ 8.)  DHS is again utilizing the

ACCT process, with CRA's assistance, for the Murray closure.  (Casey Decl. ¶ 19.)  Person-

centered planning generally involves a highly individualized assessment of each resident.  (1/7/14

Hr'g Tr. (Henson) at 51, 58; 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 52, 58, 74–75; *see* Casey

Decl. ¶ 19.)  Under the person-centered approach, the methodology is to develop a community

program around the disabled individual, such that the overall program, including housing and

services, is tailored to his or her particular needs.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 15, 19–20;

1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 51, 53.)

Dr. Mayer provided detailed testimony in his declaration about the purpose and

mechanics of the ACCT process.  (Mayer Decl. ¶¶ 9–19.)  Plaintiffs do not challenge

Dr. Mayer's description of the ACCT process itself, and we thus adopt his testimony about the

steps involved in the ACCT process.  (*Id.* ¶¶ 11–19.)  By way of brief overview, the assessment

portion of the ACCT process typically includes a records review, a meeting with the resident and

guardians to generate a Person-Centered Plan ("PCP"), any potential further clinical screening,

and the creation of a planning and support budget report, which covers fifteen domains (such as

medical, dental, nursing, mobility, and behavioral support) and recommends specific services and

supports. (*Id.* ¶¶ 15–18; *see also* Casey Decl. ¶ 19; *see, e.g.*, Dufresne Decl. ¶¶ 14–17

(describing the placement portion of the ACCT process) & Ex. 4 (flow chart of ACCT process).)

Seven or eight credentialed professionals participate at various stages of each individual's

assessment in the ACCT process. (Mayer Decl. ¶ 14; *see id.* ¶ 13 (identifying the assessment

professionals and their qualifications); *see also* Casey Decl. ¶ 19; 1/7/14 Hr'g Tr. (Freeman) at

140–41 (acknowledging that the ACCT evaluations are completed by credentialed professionals);

1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 72–73.) Where a community provider is selected, the

ACCT professionals attend the pre-transition meeting to ensure that the provider and PAS agent

understand the individual's needs. (Mayer Decl. ¶ 19.)

> **B.    Plaintiffs' Substantive Concerns about the ACCT Process**
>
> **1.    Philosophical Underpinnings**

Although Plaintiffs do not specifically argue that the steps of the ACCT process are

inherently inadequate,[6] or that the CRA professionals are not adequately credentialed, they

contend that the underlying premise of the process is flawed, infecting the entire approach. (*See*

Post-Hr'g Mem. at 9–10; Post-Hr'g Reply at 4, 6–7.) As Defendants have repeatedly

acknowledged, the ACCT process "is based on the belief that all persons with developmental

---

[6] Of course, Plaintiffs do not approve of the ACCT process, and we do not suggest
otherwise. We summarize Plaintiffs' specific concerns about the ACCT process below, but, on
the whole, they do not dispute Mayer's outline of the clinical process or challenge its
components. (Post-Hr'g Reply at 9, *directing to* Pls.' Proposed Findings at 3–16 (raising
concerns about the purpose and goals of the ACCT process, the State's lack of savings, the
reliance of PCPs on the information already contained in the individual service plans ("ISPs")
prepared by Murray staff, the general difficulty in ascertaining the wishes of a non-
communicative person, and the requirement that guardians participate in the ACCT process).)

disabilities can be served in a community setting with the appropriate supports and services."
(Mayer Decl. ¶ 10; Casey Decl. ¶¶ 13, 20; Dufresne Decl. ¶ 8; *see* 1/8/14 2 p.m. Hr'g Tr. (Casey)
at 16–20; 1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 49–53; 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 4.)
Defendants relatedly assert that "[t]here are virtually no services available in an SODC that are
not available in a community setting," such that the setting can be designed to suit the resident in
accordance with his or her individual plan. (Casey Decl. ¶ 20.) Plaintiffs decry this "reverse-
engineering" mentality, insisting that the ACCT process thus predetermines every resident's
assignment to a CILA upon Murray's closure, regardless of their needs. (1/7/14 Hr'g Tr. (Kelly)
at 222, 224–25, 241–42, 246; *see also* 1/7/14 Hr'g Tr. (Freeman) at 148, 151, 170–71; Burke
30(b)(6) Decl. ¶¶ 7–8.)

In support of their position, Plaintiffs rely on the testimony of Dr. Karen Kelly, who is a
registered nurse, a faculty member at the School of Nursing at Southern Illinois University at
Roosevelt, and a Murray guardian for her son, Eric. (1/7/14 Hr'g Tr. (Kelly) at 202–14
(describing her professional experiences as well as her son's needs).) Dr. Kelly testified, based
on her decades of nursing experience, that "the big flaw in [the ACCT process] is that it has a
predetermined outcome." (*Id.* at 224; *see also id.* at 225.) And based on her personal
experiences caring for Eric, Dr. Kelly testified that he requires a higher level of supervision than
could be provided in a CILA. (*Id.* at 226–29.) Dr. Kelly explained that she does not have faith in
the ACCT process and will not allow her son to go through it. (*Id.* at 221–22, 241–42, 246, 250.)
She emphasized that while community arrangements may suit some disabled or mentally ill
individuals, "some people are never going to fit in the community." (*Id.* at 249 (stressing that
"one size does not fit all").)

Plaintiffs further point out that the PAS agent for Murray residents, Ann Yaunches, has authorized CILA placement for every Murray resident who has completed the ACCT process, including more than twenty OSG wards. (Yaunches Dep. at 18–19, 28–29, 34, 37 (Dkt. No. 373-1); *see also* 1/7/14 Hr'g Tr. (Freeman) at 171.) Moreover, she has concluded that none of those Murray residents are eligible for services in an SODC placement because they are not considered a danger to themselves or others.[7] (1/16/14 Decl. of Ann Yaunches ¶ 5 (Dkt. No. 661-1); Yaunches Dep. at 25, 28–29, 46.) If the PAS agent completes the necessary form indicating that an individual is not eligible for an SODC, the guardian cannot choose that option. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 50–56.)

Nonetheless, according to Defendants, the PAS agent would not typically participate in a resident's transfer from one SODC to another SODC. (Yaunches Decl. ¶ 5 ("An SODC transfer occurs outside the PAS process."); *see also id.* ¶ 9; 1/7/14 Hr'g Tr. (Henson) at 50.) Both Casey and Yaunches stated that families do not need to go through the PAS agent for an inter-SODC transfer. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 87–88; Yaunches Decl. ¶ 9 (explaining that the PAS agent is not required to be part of the process if a resident goes through the ACCT process and wants an ICF/DD placement, although the agent remains available to help locate ICF/DD options).) Additionally, although all SODC placements are intended to be temporary, the Division has relaxed its position for Murray residents and will allow residents to transfer to other SODCs if requested by guardians. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 88–89; Yaunches Decl. ¶ 5; *see, e.g.*, 1/7/14 Hr'g Tr. (Kelly) at 250 (testifying that she could work with Murray staff now, or

---

[7] Yaunches testified in her deposition that an individual cannot be placed in the community, via the HCBS Waiver Program, if they require 24-hour nursing care, or if they are considered a danger to themselves or others. (Yaunches Dep. at 46–48.)

wait, to make decisions about Eric's next placement, and that she has chosen to wait to see what happens with the lawsuit).) As a result, although Yaunches has not approved further SODC placement for Murray residents who have completed the ACCT process, this outcome is neither surprising in light of the process' goals, nor reflective of a lack of choice for guardians, who remain free to seek separate assistance to pursue an SODC transfer, as discussed in more detail below.

### 2. Quality of the Process

Beyond their challenges to the philosophy underlying the ACCT process, Plaintiffs also raise two particular concerns about its value. First, Plaintiffs contend that the ACCT process excludes Murray staff—specifically, a resident's ID team—from actively participating in assessments and transition planning as they normally would in a discharge situation.[8] Instead, CRA handles all of the planning and coordinating functions, sometimes without informing ID team members of pre-transition meetings or allowing their meaningful input. (Henson Dec. ¶¶ 6–10, 22, 26; 1/7/14 Hr'g Tr. (Henson) at 50–51; 9/22/13 Declaration of Alicia Creed ¶¶ 3–4 (Dkt. No. 241–11); 1/7/14 Hr'g Tr. (Creed) at 173–75, 176, 184–85; 1/7/14 Hr'g Tr. (Howell) at 194–95; 9/21/13 Decl. of Tracy Kiselweksi ¶¶ 2–7 (Dkt. No. 241-12); 9/23/13 Decl. of Julie Hester ¶¶ 2–11 (Dkt. No. 241-13); 9/23/13 Decl. of Adam Gibson ¶¶ 2–6, 9, 12 (Dkt. No. 262-

---

[8] Plaintiffs relatedly suggest that the ACCT process is inadequate because it does not follow the procedures outlined in Standard Operating Policy and Procedure 181 ("SOPP 181"), which is Murray's policy for facilitating community placement discharges. (*See* Henson Decl. ¶ 10 & Ex. C (SOPP 181).) Based on the record before us, it appears that SOPP 181 does not apply to transfers arranged through the ACCT process stemming from Murray's closure. The policy applies for community discharges only when requested by guardians, outside the context of a facility closure, and therefore does not govern the Murray closure. (*Id.*, Ex. C; 1/7/14 Hr'g Tr. (Henson) at 51–52; 1/8/14 2 p.m. Hr'g Tr. (Starr) at 113.)

1).) Plaintiffs feel that the ACCT process is thus deficient because Murray staff, and not CRA, has the best, most thorough, most accurate knowledge of residents based on their daily interactions. (1/7/14 Hr'g Tr. (Henson) at 59; *see* 1/7/14 Hr'g Tr. (Winkeler) at 28; 1/7/14 Hr'g Tr. (Kelly) at 245–46.)

As previously mentioned, Defendants state that DHS hired CRA because Murray staff members would not have enough time to perform their regular duties as well as prepare transition plans for each resident. (Casey Decl. ¶ 18.) In addition, Defendants assert that, at times, Murray staff have refused to participate in the ACCT process, even when invited. (1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 76–77 (describing how Murray staff have posed obstacles to the ACCT process, such as by turning their backs on CRA during meetings).) We need not delve into the details, but, for present purposes, we note that the record reveals several instances of disagreement and non-cooperation between Murray staff and CRA, often concerning notice about pre-transition meetings or access to patient records. (*Id.*; *see, e.g.*, Creed Decl. ¶¶ 4–7; 1/8/14 2 p.m. Hr'g Tr. (Starr) at 119.)

Second, Plaintiffs claim that the PCP developed in the ACCT process is pointless and ineffective because it relies almost exclusively on the ISP materials already prepared on each resident by Murray staff. (1/7/14 Hr'g Tr. (Kelly) at 224 ("[T]he narrative potion that's kind of an addendum to the [PCP] is just a cut and paste of the individual's ISP.") Freeman testified, for example, that he has read both documents for his clients but that he "didn't learn one thing hardly from the [PCP prepared by CRA] that [he] couldn't have gleaned from the ISP." (1/7/14 Hr'g Tr. (Freeman) at 150 (further stating that he could write a PCP himself because the information in the PCP is nothing other than what the ISP contains).) Casey confirmed that the Division uses

the ISPs, adding that "it would be foolish not do so."  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 21

(stating that the ISP represents "good, valid information placed in the file by people who know

the individual reasonably well").)  Casey and others also testified about the other steps in the

ACCT process, including the PCP meeting with residents[9] and guardians and CRA's

consideration of whether additional evaluations are necessary to get a more thorough picture of a

resident's needs.  (*Id.* at 21–22; 1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 57, 77; Mayer Decl.

¶¶ 11–19; *see also* 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 25–26 (discussing benefits of the

ACCT process, even for residents and guardians who elect not to pursue community living).)

### C.    Plaintiffs' Opportunity to Opt Out of the ACCT Process

In addition to their claims about the value of the process, Plaintiffs are also concerned

that they are being forced to participate in the ACCT process, with its predetermined CILA

outcome.  It is undisputed that the Division wants each family to consider community placement.

(1/8/14 2 p.m. Hr'g Tr. (Casey) at 23–25; Casey Decl. ¶¶ 23–25.)  Casey stated, for example, that

"[i]t is DHS's plan that every resident at Murray should be assessed for a community placement,"

(Casey Decl. ¶ 23), and that he advises "any family . . . to look very carefully at that kind of

home, to participate in the process," (1/8/14 2 p.m. Hr'g Tr. (Casey) at 23).  (*See also* Defs.'

_____

[9] The hearing included testimony about the total inability of some residents to communicate during the PCP meetings and to express their preferences for their next placement. (1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 54–59, 64–66; 1/9/14 9:30 a.m. Hr'g Tr. (Holzhauer) at 86–87.)  While this testimony highlights the limitations of both the residents and the ACCT process, we find it immaterial.  Caring for these individuals, including assessing them for living arrangements, require caregivers and guardians to make inferences about their needs and desires on a daily basis.  It is thus irrelevant that Murray staff and/or ACCT professionals must rely on the "best representations," including any guardian participation, of resident wishes.  (1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 66 (acknowledging that CRA must rely on input from the group for a best guess of what a noncommunicative resident may prefer).)

Ex. 207 (email thread between Doyle and Holzhauer, in which Doyle states that the "emphasis in this ACCT process is on homes of 4 persons or fewer").)

Plaintiffs presented circumstantial evidence at the hearing to support their claim that they are being forced into the ACCT process.[10] Plaintiffs point out that DHS has not been open with them about the process or CRA's involvement. Mark Doyle, the Transition of Care, Projects Manager for the State of Illinois, instructed Rick Starr, the acting director of Murray, "to keep CRA underneath the radar." (1/8/14 2 p.m. Hr'g Tr. (Starr) at 96–97 (testifying further that it would have been "fair" to let the guardians know about CRA from the beginning).) Starr also admitted that, despite his role at Murray as the liaison with guardians for the ACCT process, he has never told any guardians that residents could be assessed for transition by Murray staff, rather than by CRA through the ACCT process. (*Id.* at 125–26.)

Although Starr has not notified guardians about the option to opt out of the ACCT process, Casey did so at an informational session with Murray guardians prior to the filing of the lawsuit. On September 9, 2012, at a meeting with the MPA, Casey stated:

> There's no, there's no legal requirement, none, to involve yourself in the CRA process, and if you want to opt out of it, we will still help you through the [PAS] agency, through my staff, and through other staff we have, to, to get your, help you select an alternate place for someone to live. You do not have to go through the CRA process. There's a direct answer to your question.

(Defs.' Ex. 102 (9/9/12 MPA Mtg. Tr.) at 64; *see id.* at 65 (reiterating, in response to a question from Winkeler, that "[y]ou do not have to go through the CRA process, that's correct."); *see also* Defs.' Ex. 207 (email thread between Doyle and Holzhauer, in which Doyle expresses his belief

---

[10] Whether this alleged coercion would be unlawful discrimination as argued here is a separate legal question, which ultimately we need not address.

that the ACCT process has value for those who will reject a CILA option but does not suggest that the process is required of those families).)  In a written exchange with a reporter in the Centralia area, the Communication Manager for DHS, Januari Smith, also stressed that DHS "will work with individuals/families that prefer to transition to other SODCs or private . . . [ICF/DDs]" on a case-by-case basis.  (Defs.' Ex. 109 (April 2013 email thread between Smith and Monica Seals, as forwarded by Seals[11] to Winkeler).)

Despite Casey's unequivocal 2012 statements to the MPA, it is undisputed that CRA—at DHS's instruction—began reviewing Murray resident files over guardian objections in the summer of 2013.  (Casey Decl. ¶ 25; 1/8/14 2 p.m. Hr'g Tr. (Casey) at 61–64; *see also* 1/7/14 Hr'g Tr. (Winkeler) at 42–44; 1/8/14 2 p.m. Hr'g Tr. (Starr) at 94–95; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 13–17.)  The vast majority of Murray guardians inserted notes in their wards' files refusing to allow CRA to assess their wards.  (1/7/14 Hr'g Tr. (Winkeler) at 42–44 (testifying that roughly 195 guardians had notices added to resident files stating that they could not be reassessed under the ACCT process); *see* 1/7/14 Hr'g Tr. (Kelly) at 241); Defs.' Ex. 114 (Winkeler forms, which seek to (1) prohibit CRA from approaching or interviewing her son, or reviewing his records; and (2) direct DHS that any assessments for transfer should be completed by SODC staff only).)  Despite the guardians' position, DHS ordered CRA to begin reviewing a small number of files.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 63–65; *see* 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 24 (testifying that less than fifteen files were reviewed).)  Indeed, by email dated March 27, 2013, Doyle stated that DHS was "fully prepared to move forward with evaluations

---

[11] In addition to her position in the press, Seals also appears to be involved with MPA. (Defs.' Ex. 105 (1/13/13 Winkeler email indicating that Seals is part of the MPA legal committee).)

even without guardian consent if necessary." (Pls.' Ex. 17 (3/27/13 Doyle email to Jack Lavin and others) (emphasis omitted).)

In his testimony, Doyle attempted to draw a distinction between the full ACCT process—from which a guardian may withdraw—and a records review by CRA—which DHS felt compelled to perform regardless of guardian wishes. (1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 14–17; *see id.* at 16 ("Just because they opt out of the CRA process doesn't mean they're opting out of an assessment.").) In any event, CRA admittedly reviewed files over guardian objection. CRA did not hold planning meetings with residents or guardians, or proceed with further steps in the ACCT process. (*Id.* at 33–34.) Doyle testified that the records reviews were necessary to see the status of the file, to plan how many clinical assessments might be needed, and to make sure they had sufficient resources to meet those needs. (*Id.*; *see also* 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 9–10.)

On the whole, the record demonstrates that DHS has not communicated consistently or effectively with Murray guardians about the ACCT process. While DHS likely faces pressure from all sides concerning the Murray closure, this unacceptable misstep, quite frankly, appears to be a root cause of this dispute.

Based on the record before us, however, we find that DHS does not require Murray guardians to participate in the ACCT process. Consistent with his 2012 statement to the MPA, for example, Casey testified at the hearing that families could opt out of the ACCT process, "start the process and stop it if they choose," or see it through but reject the results. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 24; *see also id.* at 25 ("If they don't wish to use that process or if they wish to step out of the process at the beginning, in the middle or at the end, we will assist them in finding

an alternate placement.").) Dufresne similarly testified that the "ACCT process is an on-off switch," (1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 22), which can be declined or terminated at any time, (*id.* at 24–25). (*Id.* at 25 (noting by way of an example that "a previous witness," presumably Holzhauer, began the process "and has now decided not to partake" further); *see also* 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 17 ("They can opt out of the CRA process.").) Additionally, there is no suggestion (or evidence) that Defendants forced Jacksonville guardians to participate in the ACCT process when that facility was slated for closures. (*See* 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 34; 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 26–29.)

Overall, the evidence presented demonstrates that—despite Defendants' insistence on access to files—families may opt out of the ACCT process and, as discussed further below, may reject CILA recommendations. (*See, e.g.*, Defs.' Ex. 101 (SODC Implementation Outline & Key Features Plan Elaboration at 9 (Dkt. No. 1-1) (explaining that CRA is not responsible for inter-SODCs transfers); Defs.' Ex. 102 (9/9/12 MPA Mtg. Tr.) at 134 (discussing the regular process to be used for transition planning if a guardian opts out of the ACCT process).) In light of Plaintiffs' confusion, DHS would be wise to clarify exactly how and to whom guardians should express their wishes to decline or cease participation in the ACCT process, the full ramifications of that decision, and how guardians should proceed for individualized assessment and placement outside the ACCT process.

## IV.  PLAINTIFFS' CONCERNS ABOUT GUARDIAN CONSENT

Plaintiffs argue not only that Defendants are requiring them to engage in the ACCT process, but also that they are forcing them to accept CILA placements, with no other option, in violation of their rights and their wishes. It is undisputed that the ACCT process is designed to

identify what supports and services are needed for a developmentally disabled individual to live in a CILA, so as to effectuate a transition to the community. Plaintiffs allege that DHS, in furtherance of the Initiative, has refused to offer alternatives to CILA placement and, thus, is depriving them of both services and choice.

### A. Guardian Consent for Community Placements

Plaintiffs testified that Defendants have refused to offer, or help locate, placements for Murray residents at other SODCs, private ICF/DDs, or at any type of facility other than CILAs. (Winkeler Decl. ¶ 16; Kelly Decl. ¶ 8–9; Decl. of Jeanine Williams ¶¶ 3, 9 (Dkt. No. 241-7); Holzhauer Decl. ¶ 5.) Winkeler, Holzhauer, and Kelly testified that in a January 15, 2013 meeting with Doyle, he stated that the only type of placements under consideration were two-to-four bed CILAs. (1/7/14 Hr'g Tr. (Winkeler) at 45–46; 1/7/14 Hr'g Tr. (Kelly) at 229–3l; 1/9/14 9:30 a.m. Hr'g Tr. (Holzhauer) at 79–80.) Winkeler and Kelly testified that Doyle specifically indicated at that meeting that SODCs other than Murray were not an option. (1/7/14 Hr'g Tr. (Winkeler) at 45; 1/7/14 Hr'g Tr. (Kelly) at 230 (stating further that no one from DHS has told her than another SODC is an option).) In a January 17, 2013 meeting with a CRA representative, Holzhauer was again told that two-to-four bed homes were the only option. (1/9/14 9:30 a.m. Hr'g Tr. (Holzhauer) at 80.) Plaintiffs thus contend that DHS is forcing them to accept CILA placements as the only choice, stripping them of their right to consent to such placements.

On the whole, however, the facts in the record—including uncontroverted written evidence—do not support a finding that Defendants are impeding or would impede Plaintiffs' right to consent to, or reject, community placement. For example:

- Kelly reported, by email dated May 18, 2012, that Doyle told her that SODCs would be available if guardians desired them, because the State was not closing all SODCs. (Defs.' Ex. 103 (5/18/12 Kelly email).)

- In her July 20, 2012 email intended for distribution to MPA members, Winkeler recounted a meeting with Dufresne, Doyle, Casey and others, wherein Casey "said that under federal law parents have the right to decide the final placement for their loved one." (Defs.' Ex. 106 (4/20/12 Winkeler email to Becherer).)

- In his September 9, 2012 comments at the MPA meeting, Casey stated that guardians "have a right to choice between an [ICF], either public or private, or a community program" as among willing and qualified providers. (Defs.' Ex. 102 (9/9/12 MPA Mtg. Tr.) at 14; *see also id.* at 22 (DHS is "not going to force you into the four-bed group home.").) Casey further clarified that, if at the end of the ACCT process a guardian decides that SODC placement is necessary, DHS would "talk to you about that at the time, but yes, it's an option." (*Id.* at 85.)

- In a January 18, 2013 email to Winkeler, following their meeting, Doyle recognized Winkeler's unwillingness to participate in the ACCT process or consider a CILA placement for her son. Doyle encouraged Winkeler to "contact the Murray social worker and begin sooner than later the process of seeking out a private ICF/DD." (Defs.' Ex. 100 (1/18/13 Doyle email to Winkeler).)

- Januari Smith's email to Monica Seals, relayed to Winkeler, provides that "if there are circumstances in which alternatives to community placement need to be considered they will be addressed on a case by case basis." (Defs.' Ex. 109 (4/17/13 email thread).). Smith repeatedly stated in her communication to Seals that DHS "will work with individuals/families that prefer to transition to other SODCs or private . . . [ICF/DDs]." (*Id.*)

Relevant witness testimony also uniformly demonstrates that no Murray resident has been or would be transferred into the community over guardian objection. For example:

- Kelly admitted that she has known, since before the lawsuit was filed, that no community provider would accept her son over her objections. (1/7/14 Hr'g Tr. (Kelly) at 247–48.) She further testified that, while she knows DHS cannot compel community placement, she fears that other less-informed parents could be intimidated by Defendants. (*Id.* at 248.)

- Henson, a Murray social worker, testified that a resident cannot leave for a community placement unless the guardian signs a document. (1/7/14 Hr'g Tr. (Henson) at 49.)

- Freeman, the GAL for the OSG wards, confirmed that the guardian—whether public or private—must consent to a CILA placement. (1/7/14 Hr'g Tr. (Freeman) at 149.)

- Casey, Starr, and Doyle each stated that guardians must consent before any transfer, whether to a CILA or otherwise. (1/8/14 2 p.m. Hr'g Tr. (Casey) at 24 ("The guardian always retains the ultimate choice."); *id.* at 22–24, 61, 65; 1/8/14 2 p.m. Hr'g Tr. (Starr) at 119; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 34; *see also* Casey Decl. ¶ 23.)

- Mayer and Dufresne similarly testified that guardians are free to ignore the recommendations of CRA personnel and that guardians make the final placement decision in every case. (1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 59–60; 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 26; *see also* Dufresne Decl. ¶ 10 ("[CRA] will never continue to recommend transition into a CILA in the absence of a guardian's consent."); Mayer Decl. ¶ 10.)

- To date, the transfers of Murray residents into CILAs have occurred only with guardian consent. (*See* 1/7/14 Hr'g Tr. (Henson) at 48–49; 1/7/14 Hr'g Tr. (Freeman) at 135–38; 1/7/14 Hr'g Tr. (Howell) at 191 (confirming her understanding that two Murray residents, T.K. and M.A., moved to their home with guardian consent); 9/21/13 Decl. of William Fields ¶ 5 (stating that he consented for J.F.'s transfer to a CILA).)

Moreover, there is no evidence that Defendants—the same actors, using the same procedures—transferred Jacksonville residents into community homes against guardian wishes, when that facility closed in 2012. (*See, e.g.*, Casey Decl. ¶ 32 (noting that some Jacksonville families chose SODCs or private ICF/DDs, while others refused to participate in the ACCT process and their wards transferred to other SODCs).) In fact, the evidence shows that Jacksonville residents transitioned to other SODCs and private ICF/DDs, as well as CILAs or other community options. (Casey Decl. ¶ 32; *see also* 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 29; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 27–28, 34.) Even when DHS could not ascertain guardian wishes—because they neglected to provide direction—DHS transferred Jacksonville residents to other SODCs but did not elect unilaterally to place them in the community. (1/8/14

2 p.m. Hr'g Tr. (Casey) at 65–66.)  Consistent with this evidence, we cannot find that Defendants

have forced, or likely will force, Murray residents into CILAs without guardian consent.[12]

B.      **Feasible Alternative**s

Yet we also assess Plaintiffs' consent argument as a basic logistical concern.  Indeed,

Plaintiffs assert that a choice among nonexistent options is no choice at all.

Plaintiffs point out that there may not be enough spots available at other SODCs to

accommodate Murray residents in the event that, as can be reasonably expected, many guardians

insist on an institutional placement.  As of June 14, 2013, for example, the six SODCs slated to

remain open had the capacity to take 100 additional residents, with some renovations and added

staffing support at the Fox and Shapiro locations.  (Pls.' Ex. 18 (6/14/13 Greg Fenton email to

Doyle with census and capacity numbers); 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 21–23.)  That

June 2013 capacity could not accommodate all, or even half, of the roughly 225 Murray

residents, if families reject the ACCT process and/or a community recommendation.

Plaintiffs also offered evidence indicating that private ICF/DDs lack sufficient capacity to

accept a significant number of Murray residents, or could decline to accept them.  Shaver

testified, for example, that although Bryan Manor could serve individuals with severe disabilities

like many of the Murray residents, the ICF/DDs in Illinois generally could not handle more than

handful of such individuals.  (*See* 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 15, 37.)  Shaver stated

that Bryan Manor is "full all the time," with a waiting list.  (*Id.* at 38.)  Other witnesses described

_____

[12] We do not suggest that Plaintiffs lack credibility, specifically with respect to testimony about the January 15, 2013 meeting with Doyle.  Even if Doyle misstated DHS's position at that meeting, however, we credit the overwhelming weight of evidence showing that residents will not be placed in CILAs over guardian objections.

how ICF/DDs can deny admission and can expel residents if they feel a placement is not working. (Winkeler Decl. ¶ 14 (learning that two facilities do not have capacity to take her son); Kelly Decl. ¶ 9 (stating that she "will not be able to secure the [DD] treatment Eric requires on my own"); Burke 30(b)(6) Decl. ¶¶ 9–11 (explaining that "private facilities do not have to accept residents, or may accept an individual and then expel him or her, as has been the experience of many guardians" and recounting that her son was expelled from at least two such facilities); Williams Decl. ¶¶ 9, 15 (stating that she has not been able to obtain ICF/DD treatment for her brother); *see also* Schoppet Decl. ¶ 3 (noting that her son was rejected by ICF/DDs when she applied in 2001). Under these circumstances, and as Casey conceded, SODCs represent "the safety net for the system." (1/8/14 2 p.m. Hr'g Tr. (Casey) at 69.)

With respect to CILAs, the hearing included evidence that Defendants have had some difficulty developing community housing suitable for Murray residents, particularly in the Centralia area. As Shaver explained, most of the housing would need to be new construction, as a more cost-effective means of accommodating medical equipment, lifts, special tubs, oversized bathrooms, or other amenities necessary to ensure accessability. (1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 40–41.) A DHS document confirmed as much, noting that both lead time and rent decisions would be critical for developers to enter into contracts and begin their work, particularly when approximately 100 Murray residents would require fully-accessible homes for wheelchairs. (Pls.' Ex. 19 (3/3/13 Issue Paper); *see also* Casey Decl. ¶ 37 (addressing fiscal concerns).) Due to negative reactions and pressure from the community, Defendants ceased

development in Centralia and began looking for housing opportunities in other communities.[13] (1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 28–33 (describing instances of harassment of staff, residents, and developers at homes in Centralia, the lack of support from the city council and public, and developers' reluctance to open homes there); Pls.' Ex. 21 (6/19/13 Doyle email to Jack Lavin re: City of Centralia Focus).)  Plaintiffs contend that, under these facts, they lack legitimate housing options should Murray close, rendering the promise of consent meaningless.

Construing the facts on the whole, however, we are not persuaded.  We do not find Plaintiffs' interpretation of the facts convincing because it overlooks the deliberate pacing of the process as well as DHS's efforts thus far to provide accommodations.

Although it is undisputed that additional housing options, institutional or otherwise, will be needed for the roughly 225 Murray residents upon closure, the record demonstrates that it is neither necessary nor feasible for those options to be physically available right now.  While Plaintiffs' position raises valid questions about capacity and timing, Defendants cannot yet be expected to have concrete answers for each resident—particularly when Plaintiffs generally have refused to cooperate to help secure housing options of any kind.  (1/7/14 Hr'g Tr. (Kelly) at 250–51 (testifying that the MPA has agreed, as a group, not to work yet with Murray staff to coordinate future placements, outside the ACCT process, because they prefer to wait and see what happens with this litigation); Defs.' Ex. 125 (2/25/13 Winkeler email intended for

---

[13] Plaintiffs themselves have discouraged the development of group housing in Centralia. Shaver testified that Winkeler instructed him to "hold off" on developing larger homes, as he had planned and had offered to do once he concluded the closure would likely proceed.  (1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 66–70.)

distribution to MPA members[14]).)  As Defendants have described it, the transition process
requires them to work with Plaintiffs—preferably through the ACCT process—to identify what a
Murray resident needs from their next home and only then develop and/or identify specific
choices from providers, whether public or private.  (*See* Dufresne Decl. ¶¶ 15–16 & Ex. 4.
(flowchart of ACCT process); 1/9/14 9:30 a.m. Hr'g Tr. (Mayer) at 67–70 (discussing how the
provider is involved in the transition planning process to develop a suitable home); *see also*
1/8/14 2 p.m. Hr'g Tr. (Casey) at 14–15 (describing the person centered planning approach, as
the opposite of a "slot mentality")); Defs.' Ex. 102 (9/9/12 MPA Mtg. Tr.) at 18–19.  Thus,
by design, the moment for guardian choice comes later.

Nonetheless, for guardians prepared to elect an institutional placement, DHS has
expressed its willingness to allow and effectuate those transitions.  As mentioned earlier, DHS
has repeatedly stated that SODCs will be an option, which can be discussed with guardians on a
case-by-case basis.  (*See, e.g.*, 1/8/14 2 p.m. Hr'g Tr. (Casey) at 24, 55, 59, 88–89; 1/9/14
9:30 a.m. Hr'g Tr. (Doyle) at 34.)  Murray and Jacksonville residents have transferred to other
SODCs by choice.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 88–89; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle)
at 26–27, 34; Casey Decl. ¶ 32.)  Casey admitted that it would be "counterproductive" if the

---

[14] In her email, for example, Winkeler advises the MPA membership that:

> If the worst happens and the injunction does not occur then we will have
> PLENTY of time to find suitable housing for our loved ones.  Do not rush
> into a situation you will regret.  If you are happy with Murray Center then the
> best course of action is to WAIT, and do nothing.

(Defs.' Ex. 125 (emphasis in original).)  Murray guardians, of course, are free to
make placement decisions for their wards as they see fit, despite any pressure
from either the MPA or DHS.  (*See, e.g.*, 1/7/14 Hr'g Tr. (Winkeler) at 41–42.)

majority of Murray families elected another SODC placement in lieu of considering CILAs. He

nonetheless stated that, should that occur, he will find some way to respect those choices.

(1/8/14 2 p.m. Hr'g Tr. (Casey) at 59.)

To that end, DHS has been working to increase capacity at the six other SODCs. (Casey

Decl. ¶ 26; 1/9/14 9:30 a.m. Hr'g Tr. (Doyle) at 37–39.) Recognizing that "many families were

going to opt for other SODC placements," Defendants began resident assessments in the summer

of 2013 for potential community placement for interested families from other locations. (1/9/14

9:30 a.m. Hr'g Tr. (Doyle) at 39.) At the hearing, Doyle testified that he anticipated

approximately 95 additional transitions to be completed by March 2014 and that DHS would

continue "to build capacity for potential Murray folks."[15] (*Id.*) DHS representatives have also

stated that the Division will help Murray guardians seek placements at private ICF/DDs. (1/9/14

9:30 a.m. Hr'g Tr. (Doyle) at 35; 1/8/14 2 p.m. Hr'g Tr. (Casey) at 22–25; Defs.' Exs. 100, 109;

*see also* Yaunches Decl. ¶¶ 5–6, 9.)

When we consider all of these facts, including how the process works and DHS's ongoing

efforts to increase SODC capacity, we find that Defendants have not deprived, and will not

deprive, Plaintiffs of their right to choose among placement options, even if those options have

yet to be fully realized.

## V.     CONCERNS ABOUT SERVICES PROVIDED IN CILAs

Apart from their concerns about the ACCT process, Plaintiffs highlight some of the

problems they identified with the level of care provided at CILAs, as well as a few specific

---

[15] If Doyle's estimate held up, DHS could therefore accept roughly 195 inter-SODC
transfers from Murray, subject to other admissions and discharges in the interim.

incidents that have occurred when Murray or Jacksonville residents have transitioned into the community.[16]  Plaintiffs contend that these facts show that CILAs cannot offer adequate services for their wards and, to the contrary, will endanger their health and safety.

Plaintiffs cite to the testimony of Freeman, the GAL for several Murray OSG wards, including fourteen individuals who have already transferred into CILAs from Murray.[17]  Freeman has visited his clients' CILA homes unannounced and identified several concerns at one or more of these facilities, including: (1) lack of on-the-job experience among the staff; (2) low pay and excessive work hours for the staff; (3) unlocked doors and/or medication containers; (4) inadequate padding for a client who exhibits self-injurious behavior; (5) insufficient sheets or safety measures for an client with pica disorder; (6) cleaning materials left in open access to the residents; (7) lack of an appropriate biohazard disposal receptacle; and (8) lack of personalization or decoration.  (Freeman Decl. ¶¶ 10–16; *see* 1/7/14 Hr'g Tr. (Freeman) at 116–18.)  Freeman

---

[16] Plaintiffs relatedly point out that CILAs cannot provide twenty-hour nursing for disabled individuals.  The record includes conflicting testimony on whether Murray residents currently require, or receive, twenty-hour nursing care.  (*Compare* Casey Decl. ¶ 20 (stating that although a nurse may be on duty at some cottages at all times, "no one at Murray receives 24 hour per day nursing care") *and* 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 57–58 (testifying that 122 Murray residents attend his workshop daily and, despite their spectrum of issues, are capable of going out into the community) *with* Pls.' Ex. 10 (Starr 6/24/13 email, reporting that 42 residents from two cottages "will need 24 hour nursing care").)  Perhaps there is some distinction—not addressed by the parties—between requiring nursing care twenty-four hours a day as a medical matter and benefitting from a nurse's presence on site twenty-four hours a day.

Regardless, Defendants acknowledge that twenty-four hour nursing is not available in the community, although "any amount short of 24 hours is available . . . if medically necessary and would be funded."  (Casey Decl. ¶ 20; Yaunches Dep. at 46–48.)  Based on the evidence to date, it appears that Murray residents who medically require twenty-hour nursing would not be eligible for community placement at all, but Murray residents who require regular but less-than-twenty-hour nursing care can be accommodated in the community.

[17] Freeman's wards are not yet officially discharged from Murray but have been living at CILAs on "pre-transitional visits" for roughly a year.  (Freeman Decl. ¶ 8.)

encountered staff who did not know the location of the fire extinguishers or who lacked knowledge about the use and location of medication logs.  (Freeman Decl. ¶¶ 12–13.)  Freeman found that staff at two locations were not aware of, or conscientious about, resident dietary needs.  (*Id.* ¶¶ 12, 15.)

In addition, CILA employees informed Freeman that they would sometimes transfer residents to another home for six to twelve hours, if staffing was short, and that employees would purchase items for residents with their own money if needed, including Ensure when a resident ran out of his or her required nutrition for a feeding tube.  (*Id.* ¶ 18; *see also* 1/7/14 Hr'g Tr. (Freeman) at 116–26; 1/7/14 Hr'g Tr. (Gibson) at 84–85.)  Freeman also testified that he heard that CILA staff were not grooming residents adequately and failed to consistently pack proper lunches for them.[18]  (1/7/14 Hr'g Tr. (Freeman) at 122–24.)  (*See also* 1/7/14 Hr'g Tr. (Rapp) at 91–93.)

A few incidents require brief mention.  One on occasion, CILA staff ran out of a client's seizure medication and could not obtain a refill for three or four days, which resulted in the resident having several seizures and requiring hospitalization.  (Freeman Decl. ¶ 15; 1/7/14 Hr'g Tr. (Freeman) at 119–21.)  At another location, in October 2013, Freeman dropped by in the

---

[18] Much of the anecdotal testimony in the record—as presented by both parties—about the condition of particular CILAs or resident progress is hearsay.  (*See, e.g.*, Casey Decl. ¶ 36; Freeman Decl. ¶¶ 18; 1/7/14 Hr'g Tr. (Freeman) at 116–26.)  To the extent such testimony is hearsay, we do not exclude it at this stage.  (*See* 12/5/13 Op. (Dkt. No. 321) at 6.)  In light of the opportunity here for the parties to develop a record prior to the preliminary injunction hearing, however, we decline generally to afford hearsay evidence as much weight as non-hearsay evidence.

That being said, we have not relied on Defendants' exhibits 205 and 206, to which Plaintiffs objected, because we find them immaterial to our decision.  We relatedly have not considered exhibits A, B, and C attached to the January 16, 2014 declaration of Rhonda Harris.  (*See* Pls. Rebuttal to Affs. (Dkt. No. 373) at 2–3.)

middle of the afternoon and found all three of the home's employees outside smoking cigarettes, while the residents were inside unsupervised.  (1/7/14 Hr'g Tr. (Freeman) at 124–26.)  It is undisputed that a Murray resident, J.F., did not adjust well to her community placement and did not receive the supports she required, necessitating her return to an SODC.[19]  (Kerst Decl. ¶¶ 5–7, 11–12; Fields Decl. ¶¶ 5–12, 15; 1/9/14 2:05 p.m. Hr'g Tr. (Dufresne) at 19–20 (conceding that "the community did not have the right supports at the time for her").)  Finally, as is well-established in the record, two residents of a CILA had an argument, culminating in a physical fight, on May 26, 2013.  (9/23/13 Decl. of Kelly Rapp ¶¶ 9–12; 1/7/14 Hr'g Tr. (Rapp) at 93–103.)  Only one staff member was working at the time, in violation of staffing protocol, and she called the police to help break up the altercation.  (Rapp Decl. ¶ 11; 1/7/14 Hr'g Tr. (Rapp) at 95–99.)  Although she also contacted her supervisor, both prior to and after the incident, her supervisor did not arrive at the home until approximately two hours after the fight. (1/7/14 Hr'g Tr. (Rapp) at 106–08.)

Casey conceded that these incidents occurred and constitute serious problems in the CILA placements.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 43–49; *see also* Casey Decl. ¶¶ 33–35.)  Casey further testified—and it is not disputed—that altercations and mistakes, including medication errors, also occur in institutional settings.  (1/8/14 2 p.m. Hr'g Tr. (Casey) at 46–47 (stating that about 62 peer-to-peer altercations occurred in a twelve-month period at Murray); Casey Decl. ¶ 35.)  Plaintiffs have not presented evidence that residents in community placements face a

---

[19] Numerous additional facts about J.F.'s situation are disputed.  (*Compare* Kerst Decl. ¶¶ 8–10 *and* Fields Decl. ¶ 14 *with* 1/16/14 Decl. of Cassidy Spesard ¶¶ 6–7 *and* Yaunches Decl. ¶¶ 15.)  We are not inclined to make credibility determinations with respect to conflicting declaration testimony but, in any event, these disputes are immaterial given the record before us.

significant greater risk of altercations, medication errors, or other serious problems than residents of institutional placements. Nor have Plaintiffs presented evidence that such incidents in the community would result in greater or different harm than seen in an SODC.

## LEGAL ANALYSIS AND CONCLUSIONS

With these facts in mind, we turn to the merits of Plaintiffs' motion. Plaintiffs have requested injunctive relief preventing the assessment and transfer of Murray residents and precluding the closure of Murray, and the appointment of a monitor. (*See* Pls.' Br. ISO Legal Theory (Dkt. No. 159) at 7.)

To obtain a preliminary injunction, Plaintiffs must show: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Ind. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). If Plaintiffs meet all three of these threshold requirements, then we must go on to "consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Long*, 167 F. Supp. 2d at 990 (internal quotations omitted); *Planned Parenthood of Ind.*, 699 F.3d at 972. We must also "consider how the public's interests would be affected by granting or denying the preliminary relief." *Long*, 167 F. Supp. 2d at 990; *Planned Parenthood of Ind.*, 699 F.3d at 972. With respect to all of these factors, the court applies "a sliding scale approach—the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Long*, 167 F. Supp. 2d at 990; *Planned Parenthood of Ind.*, 699 F.3d at 972; *Girl Scouts of Manitou*

*Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008).

In the event of an appeal, the Seventh Circuit would review our "factual findings for clear error, [our] legal conclusions de novo, and [our] balancing of the injunction factors for an abuse of discretion." *Planned Parenthood of Ind.*, 699 F.3d at 972; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). In preparation for any such appeal, the Seventh Circuit encourages us to "conduct at least a cursory examination of all the aforementioned preliminary injunction considerations," even if we find that the moving party fails to satisfy one of them. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1087.

## VI. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs allege that Defendants' conduct constitutes disability discrimination in violation of Title II of the ADA and § 504 of the Rehabilitation Act, denies Plaintiffs and the purported class members equal protection under the law, and deprives them of choice as required by § 1396n(c)(2)(C) of the Medicaid Act. The question posed by this first element of the preliminary injunction analysis is whether Plaintiffs have established a "better than negligible chance of succeeding on the merits of at least one of [these] claims." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096; *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001); *Washington v. Indiana High Sch. Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999). "This is an admittedly low requirement and is simply a threshold question." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). "Only after we clear the threshold inquiries and proceed to the balancing phase of the analysis must we determine how likely [Plaintiffs'] success must be for us to issue the requested injunction." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096; *Ty, Inc.*, 237 F.3d

at 895.

## A. ADA and Rehabilitation Act Claims[20] (Counts 1 and 2)

To succeed on a claim of disability discrimination under these statutes,[21] Plaintiffs must demonstrate that: (1) they are (or represent) qualified individuals with disabilities; (2) they have been denied "the benefits of the services, programs, or activities of a public entity;" and (3) the denial or exclusion was "by reason of such disability." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a); *Brad K. v. Bd. of Educ. of City of Chi.*, 787 F. Supp. 2d 734, 746–47 (N.D. Ill. 2011); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 913 (N.D. Ill. 2009). The third element—the "by reason of disability" language—requires a showing of "but for" causation. *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006); *Washington*, 181 F.3d at 849 (explaining that this language required proof that "but for his learning disability, [plaintiff] would have been eligible" for the particular program at issue). As there is no question that the Plaintiffs and their wards satisfy the first element, we turn our focus to the second and third elements.

### 1. Denial of the Benefits of Service, Programs, or Activities

We begin our consideration of this second prong with the obvious question: what services, programs, or activities have Defendants allegedly denied Plaintiffs? Plaintiffs assert that they have been excluded "from the benefits and services of the Illinois SODC program," as

---

[20] These statutory discrimination claims are construed identically. *Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004); *Washington v. Indiana High Sch. Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999) (noting that the two statutes are coextensive).

[21] The parties do not dispute that Defendants are a public entity, as necessary for an ADA claim, or that they receive federal funding assistance, as necessary for a Rehabilitation Act claim.

intended by Defendants per the goals of the Initiative and as effectuated through the ACCT process. (Post-Hr'g Mem. at 7; *see id.* at 4, 6–8, 11–12, 14, 21; Post-Hr'g Reply at 3.) They relatedly contend that they have been excluded from choice and services under the Medicaid Act. (Post-Hr'g Mem. at 6–7.)

### a. *"SODC Program"*

Plaintiffs have not specified what particular benefits, services, or activities of the "Illinois SODC program" are at issue. Plaintiffs concede that they are not entitled to receive services or benefits at any particular SODC. (*See* Pls.' Resp. to DOJ Interest St. (Dkt. No. 48) at 2–4 ("Regardless of Plaintiffs' desire to continue living in their respective SODCs, Plaintiffs do not claim a right to live in these particular SODCs.") Simply put, Murray residents and guardians have no legal claim to Murray itself. *See O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785–86, 100 S. Ct. 2467, 2475–75 (1980); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 909–11 (7th Cir. 2003).

To the extent that Plaintiffs contend that they have been, or will be, denied access to needed services at *any* SODC within the State, that claim is not supported by the record. As discussed in detail above, the evidence shows that: (1) Defendants will work with Murray guardians to arrange SODC placement for those who ultimately request it;[22] and (2) Defendants are attempting to increase capacity at other SODCs to make such placements a reality. (*See supra* Part IV.) As a result, Plaintiffs have not established even a negligible chance of success on this argument.

---

[22] Defendants assert that they are not legally obligated to offer Murray residents placements at other SODCs but are doing so to allay Plaintiffs' concerns. (Post-Hr'g Resp. at 5.) Given the facts before us, we need not comment on Defendants' position.

### b. ACCT Process

Plaintiffs' claim for a denial of benefits can be construed as an attack on the ACCT process itself rather than the deprivation of SODC placements. Plaintiffs presented evidence that Defendants have set aside their usual transition protocol, SOPP 181, and implemented the ACCT process, which does not necessarily involve substantial input from Murray staff. (*See supra* Part III.B.2.) Plaintiffs thus may be arguing that Defendants are depriving them of a "better" process involving Murray staff and instead are requiring them to participate in the ACCT process. There are several problems with this theory.

First, Plaintiffs have not established any entitlement to SOPP 181, especially in the closure context, or to any other assessment process. Second, we are not in a position to determine whether either process at issue satisfies some unarticulated objective level of acceptability, let alone which process might be "better," assuming they are not equivalent. Third, and most importantly, while Plaintiffs contest the intended outcome of the ACCT process, we have found that: (1) Defendants permit guardians to decline or cease participation in the ACCT process; and (2) guardians retain the right to reject any community placement recommendation. (*See supra* Parts III.C and IV.A.) Under these circumstances, Plaintiffs have not shown a likelihood of success on the theory that Defendants' reliance on the ACCT process itself constitutes a denial of benefits, services, or activities.

### c. Services Provided in the Community

While Plaintiffs also presumably contend that Murray residents will not receive the same level of benefits in community placements (if selected), they have not adequately identified any significant particular services, programs, or activities that Defendants have failed, or likely would

fail, to provide as needed. The record includes some evidence, for example, that dental care is difficult to obtain for the developmentally disabled in the community, but Plaintiffs have not argued that Defendants are denying access to such care. (*See, e.g.*, Defs.' Ex. 102 (9/9/12 MPA Mtg. Tr.) at 92–93 (Winkeler, stating that Medicaid will no longer pay for her brother's general dental care in his community placement, and Casey, clarifying that the problem is Medicaid-wide); Winkeler 30(b)(6) Decl. ¶ 17; Decl. of Kimberly Davis ¶¶ 12, 14.) Defendants concede that CILA placement is not an option for individuals who medically require twenty-four hour nursing care, which may include numerous Murray residents. (*See supra* Part V at n.16.) But Plaintiffs have not demonstrated that any individual who medically requires twenty-four hour nursing care has been, or likely will be, forced into a CILA that cannot meet that need. Nor can Plaintiffs make such a showing, in light of the substantial evidence that residents will not be transferred into the community over guardian objection. (*See supra* Part IV.A.)

We add that, although Plaintiffs presented evidence of personnel problems and several truly unacceptable conditions or errors at CILAs (*see supra* Part V), they have not addressed how these incidents represent a denial of benefits for ADA or Rehabilitation Act purposes, either as to the individuals affected or to the class as a whole. The parties did not raise the issue, but we perceive a potential difference between claims based on an isolated medication error or placement failure, for example, and claims based on a state's hypothetical refusal to provide a certain type of medication or program altogether. *See, e.g., Storr v. Marik*, No. 13 C 3236, 2013 WL 6577374, at *4 (N.D. Ill. Dec. 10, 2013) (noting, in the context of a Fair Housing Act accommodation claim, that the "alleged failure to remove mold, install lighting, check for potential toxins, and replace faulty windows are properly characterized as landlord-tenant issues;

they are not refusals to alter an existing policy or practice to allow an individual with a disability to enjoy the same access to property that other individuals enjoy."). No doubt there is a line to be drawn, but we need not consider it today in light of our ruling.

In sum, the record establishes that no Murray resident will be transferred to a CILA over guardian objection. In light of this choice, and the availability of placement options, Plaintiffs have not established any measurable likelihood of success on this element.

### 2.    By Reason of Disability

We turn to the third and final element of the statutory discrimination claims, the causation inquiry. *Wisconsin Cmty. Servs.,* 465 F.3d at 754; *Washington*, 181 F.3d at 849. Plaintiffs can succeed on this prong only if they demonstrate that "but for" their disabilities, they "would have been able to access the services or benefits desired." *Wisconsin Cmty. Servs.,* 465 F.3d at 754; *see also Maxwell v. South Bend Work Release Ctr.*, No. 09 C 08, 2011 WL 4688825, at *6 (N.D. Ind. Oct. 3, 2011) (stating that plaintiff must prove his disability "was a necessary condition for his removal from the program"). The Seventh Circuit has explained that "discrimination under both acts may be established by evidence that (1) the defendant intentionally discriminated on the basis of disability, (2) the defendant refused to provide a reasonable accommodation, or (3) the defendant's rule disproportionally impacts disabled people." *Washington*, 181 F.3d at 847; *Wisconsin Cmty. Servs.,* 465 F.3d at 753; *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 937 (N.D. Ind. 2009).

We begin with Plaintiffs' overarching theory that the Initiative, and by extension the ACCT process, are themselves discriminatory. In their intentional discrimination argument, Plaintiffs contend that the Initiative and the ACCT process are designed to "recast"

(i.e., downgrade) Murray residents' disabilities[23] so that the residents can be purposefully excluded from the SODC program and forced out into the community. (Post-Hr'g Mem. at 7–13.) Plaintiffs vilify Defendants' position that "all persons with developmental disabilities can be served in a community setting with the appropriate supports and services." (Mayer Decl. ¶ 10; *see also supra* Part III.B.1.) We agree with Defendants, however, that their predisposition in favor of the integration of the developmentally disabled population cannot alone constitute unlawful discrimination.

As Defendants point out, their position is entirely consistent with the Supreme Court's decision in *Olmstead.* 527 U.S. at 587, 597, 601–07, 119 S. Ct. at 2181, 2185, 2187–90. The *Olmstead* court concluded that:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607, 119 S. Ct. at 2190. The Initiative seeks to make community-based treatment a reality for more Illinois citizens who need and desire it, using the ACCT process to help determine whether the community can accommodate a particular individual. Defendants' approach does involve a presumption about the disabled, but Plaintiffs have not presented either evidence or legal argument showing that Defendants' presumption is an unlawfully discriminatory bias.

---

[23] Plaintiffs have not introduced any evidence that this "recasting" or "reverse-engineering" has taken place. The record lacks evidence, for example, that the extent of an SODC resident's disability, or a particular diagnosis, or the assessment of the individual's needs, has been altered inappropriately or intentionally during the ACCT process.

Moreover, the record demonstrates that Defendants' presumption in favor of integration is rebuttable. The parties agree that—even assuming guardian consent—not every SODC resident can be accommodated in the community, either because of the severity of their disabilities or because accommodations would not be cost-effective. (*See supra* Part II.B.; *see also* 1/7/14 Hr'g Tr. (Kelly) at 249; 1/8/14 10:30 a.m. Hr'g Tr. (Shaver) at 37–41.) This position, too, is consistent with *Olmstead*. In its opinion, the Supreme Court emphasized that "nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." 527 U.S. at 601–02, 119 S. Ct. at 2187. The court went on, specifically commenting that for some individuals, "no placement outside the institution may ever be appropriate." *Id.* at 605, 119 S. Ct. at 2189 ("Nor is it the ADA's mission to drive States to move institutionalized patients into an inappropriate setting, such as a homeless shelter."). The *Olmstead* decision thus conditions community placement on several factors, including a conclusion by the State's treatment professionals that a CILA is appropriate *and* consent from the affected person or guardian. The Initiative comports with these principles, as Defendants acknowledge that one size may not fit all and that guardians must consent to final placement decisions.

Aside from this overarching disagreement, Plaintiffs contend that their exclusion from the SODC program is "because of" their disability. We briefly address Plaintiffs' evidentiary arguments below.

### a.    *Intentional Discrimination*

To demonstrate a likelihood of success under this approach, Plaintiffs must show that "but for" their disabilities, they would continue to enjoy equal access to the services offered through the SODC program, as well as equal choice.  *Wisconsin Cmty. Servs., Inc.*, 465 F.3d at 754; *Washington*, 181 F.3d at 849.  Plaintiffs have framed this argument in various ways.  For example, in their post-hearing brief, Plaintiffs assert that "'but for' the decision to recast Plaintiffs, pursuant to a predetermined agenda, Plaintiffs would not be excluded from the SODC Program and from participation in the full gamut of ICF-MR services and choice."  (Post-Hr'g Mem. at 12.)  Plaintiffs relatedly contend that SODC residents—who are among the most severely disabled—are the "targets" of the Initiative.  As a result, Defendants' exclusion of them from the SODC program "is accomplished on the basis of disability by recasting" them for community living.  (*Id.* at 12–13; *see also* Post-Hr'g Reply at 10.)

Plaintiffs' iterations are neither clear, nor persuasive.  They do not satisfy the "but for" requirement because the "but for" cause, as described, is the Initiative itself, rather than Plaintiffs' disabilities.  There is no dispute that Murray residents are disabled and are affected by Defendants' conduct.  But we cannot infer from those facts alone that Defendants' decisions to close Murray, to implement the ACCT process, or to adopt the Initiative were made "because of" Plaintiffs' disabilities.[24]

---

[24] Nor does the record suggest that Defendants have acted with any deliberate indifference.  *See Phipps*, 681 F. Supp. 2d at 918 (noting that although intent is not required of all three Title II evidentiary approaches, the intentional approach typically requires a showing of "deliberate indifference," at least where plaintiffs seek compensatory damages); *Zachary M. v. Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 22*, 829 F. Supp. 2d 649, 662 (N.D. Ill. 2001); *Access Living of Metro. Chi. v. Chi. Transit Auth.*, No. 00 C 770, 2001 WL 492473, at *7 (N.D. Ill. May 9, 2001).

### b.    *Failure to Accommodate*

The Seventh Circuit has set forth several important guideposts for evaluating failure to

accommodate claims, also known as reasonable modification claims, under Title II.

> First, as our cases already hold, failure to accommodate is an *independent* basis for
> liability under the ADA.  Second, the plain language of the [ADA implementing]
> regulation also makes clear that an accommodation only is required when *necessary*
> to avoid discrimination *on the basis of* a disability.  Third, the regulation states, in its
> plain language, that any accommodation must be a *reasonable* one.

*Wisconsin Cmty. Servs., Inc.,* 465 F.3d at 751 (discussing 28 C.F.R. § 35.130(b)(7)) (emphasis in

original).  The court added that the pertinent regulation "clearly contemplates that prophylactic

steps must be taken to avoid discrimination."  *Id.*  Plaintiffs in these types of cases typically

request modifications to allow them to fully participate in programs or opportunities that they

otherwise would miss because of their disabilities.  *See, e.g.*, *Wisconsin Comm' Servs.,* 465 F.3d

at 741–46, 754–55 (addressing plaintiff's claim for a special use zoning permit that would permit

a mental health clinic to relocate in a particular neighborhood); *Washington*, 181 F.3d at 842–43

(addressing plaintiff's request, in light of his learning disabilities, for an exception to the rule

limiting a player's eligibility to play high school sports to eight semesters); *Culvahouse*, 679 F.

Supp. 2d at 938–42 (addressing plaintiffs' claims that the City of LaPorte violated Title II by

failing to maintain and fix public sidewalks as necessary to enable disabled residents to use them

to get around town).

Here, Plaintiffs argue that "Defendants' current plan of placing Murray residents into only

1-to-4 bed group homes *and nowhere else* violates the ADA because it fails to provide Plaintiffs

---

To the contrary, the record reflects non-discriminatory motives for Defendants' decisions.
(*See supra* Part II.B and III.B.1.)

a reasonable accommodation." (Post-Hr'g Mem. at 13 (emphasis in original).) As discussed throughout this opinion, the facts in the record do not support the assertion that Defendants have deprived or will deprive guardians of choice. (*See supra* Part III.C. and IV.) In addition, Plaintiffs have not articulated how the current plan constitutes discrimination *because of* the SODC residents' disabilities or what further necessary accommodation would help avoid that discrimination. *See Wisconsin Comm' Servs.,* 465 F.3d at 754 (stressing that the disability must be the "cause-in-fact" of the alleged deprivation). Although Plaintiffs focus on the ACCT process, (*see* Post-Hr'g Reply at 10), Defendants have offered to accommodate Plaintiffs by permitting them to withdraw from that process and, moreover, by confirming Plaintiffs' undisputed right to choose among placement options, whether or not the ACCT process is utilized. Plaintiffs have not requested any additional necessary, reasonable accommodation that could offer them relief.

### c.    *Disparate Impact*

Disparate impact claims require "proof that a facially neutral policy unjustifiably falls more harshly on a protected group than on others." *Nikolich v. Vill. of Arlington Heights*, 870 F. Supp. 2d 556, 563 (N.D. Ill. 2012); *see Daveri Dev. Group, LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 1002 (N.D. Ill. 2013). The Seventh Circuit recently clarified that disparate impact claims are cognizable under Title II even if comparing members of the same protected class, as alleged here. *Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874–75 (7th Cir. 2013); *see Nelson v. Milwaukee Cty.*, No. 04 C 193, 2006 WL 290510, at *5 (E.D. Wis. Feb. 7, 2006) ("[T]o the extent that plaintiffs allege that defendants are treating them

worse than persons with less severe disabilities, they may proceed as such claims allege differential treatment by reason of disability.").

Under this third approach, Plaintiffs assert that the Initiative, with the ACCT process, "disparately impacts the Plaintiffs from participation in the Illinois SODC Program (and services provided thereunder), and services that provide for the right to choose between adequate and safe institutional and community services." (Post-Hr'g Mem. at 14.) The crux of Plaintiffs' disparate impact argument—along with their equal protection argument—is that because they are residents of SODCs, they "have been singled out from the general adult DD population and denied equal access and equal choice" through and because of the ACCT process. (*Id.* at 20–21; *see id.* at 15, *directing to* equal protection argument at 20–23.) Plaintiffs claim that Defendants "want to deprive SODC residents of their services to give the money formerly utilized by SODC care to someone else whose disability is easier and cheaper for the state to handle." (*Id.* at 23.)

Plaintiffs contend that they are being treated differently than other developmentally disabled adults who are not subject to the ACCT process because they do not reside in SODCs.[25] But Plaintiffs have not introduced sufficient evidence that they are being treated "worse," *Amundson,* 721 F.3d at 875, or "more harshly," *Nikolich*, 870 F. Supp. 2d at 563, than this other group of individuals. Plaintiffs' attacks on the ACCT process have fallen flat, as discussed earlier. (*Supra* Part III.B, III.C, and VI.A.1.b.) In addition, the evidence overall does not support Plaintiffs' allegations that they have been or will be unjustifiably denied access to future

─────────────────

[25] Residence in a particular location alone generally cannot be the basis of a Title II or Rehabilitation Act claim. *Nelson*, 2006 WL 290510, at *5 ("[T]o the extent that plaintiffs allege differential treatment based on . . . geography, their claims must be dismissed."). We assume Plaintiffs refer to SODC residence as a proxy for the extent or severity of resident disabilities.

institutional placements or to any particular necessary services.  (*Supra* Part VI.A.1.)  Nor does the evidence before us show any likelihood at all that Plaintiffs have been or will be denied their right to consent to community placement.  (*Supra* Part IV.)

In sum, we conclude that Plaintiffs have not established a better than negligible likelihood of success on the merits of their ADA and Rehabilitation Act discrimination claims.

### B.    Equal Protection Claim (Count 4)

We turn now to consider preliminarily the merits of Plaintiffs' equal protection claim.  To prevail, Plaintiffs must show that Defendants: (1) "treated [them] differently from others who were similarly situated, (2) intentionally treated [them] differently because of [their] membership in the class to which [they] belonged (i.e., [the developmentally disabled]), and (3) because [the disabled] do not enjoy any heightened protection under the Constitution, . . . that the discriminatory intent was not rationally related to a legitimate state interest."  *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950–51 (7th Cir. 2002); *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 442, 105 S. Ct. 3249, 3255–56 (1985); *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36, 645 (7th Cir. 2001); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1037–38 (N.D. Ill. 2003).  "The core of any equal protection case is, of course, a showing of intentional discrimination."  *Bohen v. City of Chi.*, 799 F.2d 1180, 1186–87 (7th Cir. 1986); *Chavez*, 251 F.3d at 645; *Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir. 1996).

Similar to their disparate impact claim, Plaintiffs contend that Defendants are violating the Fourteenth Amendment's equal protection clause by depriving them "of programs and services afforded to other developmentally disabled adults," including the right to reject

community placement. (Post-Hr'g Mem. at 20–21.) But as with the disparate impact claim, Plaintiffs are unlikely to succeed on these allegations.

In addition, Plaintiffs' evidence to date is inadequate to show that Defendants acted intentionally, or at least with deliberate indifference for equal protection purposes. *Chavez*, 251 F.3d at 645; *Nabozny*, 92 F.3d at 453–54. This showing of discriminatory intent "implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Nabozny*, 92 F.3d at 453–54 (internal quotation omitted); *Chavez*, 251 F.3d at 645; *Anderson*, 284 F. Supp. 2d at 1038. Plaintiffs cannot succeed with proof merely that Defendants were negligent or even that Defendants were aware of the consequences of their decision. *Nabozny*, 92 F.3d at 453–54 (internal quotation omitted); *Chavez*, 251 F.3d at 645. Plaintiffs here have not offered evidence from which we could infer that Defendants have acted, in whole or in part, with the express purpose of depriving SODC residents of either placement choice or necessary services. Defendants admittedly seek to transition as many SODC residents as possible into community arrangements, but, on the facts before us, we cannot make the inferential leap necessary to find that this goal suggests intentional discrimination.[26]

---

[26] The parties also dispute Defendants' stated rationales for adopting the Initiative and implementing the ACCT process. (*Compare* Post-Hr'g Mem. at 21–23 *and* Post-Hr'g Reply at 14–18 *with* Post-Hr'g Resp. at 18–20.) We need not address these arguments in detail. For the sake of thoroughness, we add merely that the record supports a conclusion that the Initiative is rationally-related to the State's obligations under *Olmstead*. *See Smith v. City of Chi.*, 457 F.3d 643, 652 (7th Cir. 2006) ("The rational-basis test is a lenient standard" such that "the government's action simply cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."); *see also D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013); *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 946–47 (7th Cir. 2009). We decline to address the State's budgetary argument.

## C. Medicaid Act Claim (Count 5)

In addition to their discrimination claims, Plaintiffs contend that the Initiative and the ACCT process violate Medicaid and related regulations.  (Compl. ¶¶ 91–98; Post-Hr'g Mem. at 15–20; Post-Hr'g Reply at 10–14.)  Under the HCBS Waiver Program, Congress authorized funding for "states to give individuals who would otherwise be eligible to receive Medicaid benefits in a more traditional, long-term institution the option of receiving care in their home or in community-based residences." *Ball v. Rodgers*, 492 F.3d 1094, 1098 (9th Cir. 2007).  In considering Plaintiffs' claim, we are mindful that "the purpose of a waiver program . . . is to enable medically needy individuals to avoid institutionalization by making services available to them that are otherwise not part of the State's basic Medicaid program." *Radaszewski*, 383 F.3d at 611–12; *see also id.* at 601–02.

To qualify for the HCBS Waiver Program, states must provide "certain 'assurances' to the Secretary of Health and Human Services." *Ball*, 492 F.3d at 1098  (citing 42 U.S.C. §§ 1396n(c)(2), (d)(2)).  Section 1396n(c)(2)(C) requires one such assurance:

> [S]uch individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded.

42 U.S.C. § 1396n(c)(2)(C).  The parties do not dispute that Murray residents qualify for ICF-MR services and thus fall under this provision.[27]

---

[27] We previously held that Plaintiffs have a private right to enforce § 1396n(c)(2)(C) through 42 U.S.C. § 1983.  (10/8/13 Op. (Dkt. No. 286) at 18–20 (resolving motion to dismiss).)

The parties do not entirely agree, however, on how we should interpret § 1396n(c)(2)(C). (*Compare* Post-Hr'g Resp. at 13–16 *with* Post-Hr'g Reply at 10–13.)  We rely on the plain text of the statute and its regulations.  *See, e.g.*, *Krzalic v. Republic Title Co.*, 314 F.3d 875, 879–80 (7th Cir. 2002) ("Usually when a statutory provision is clear on its face the court stops there, in order to preserve language as an effective medium of communication from legislatures to courts."); *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 76 (D. Mass. 2000) (relying on "traditional statutory analysis" to interpret § 1396n(c)(2)(C)).  On its face—and as is consistent with the purpose underlying waiver programs—§ 1396n(c)(2)(C) requires states to inform covered individuals about any options available under the HCBS Waiver Program (i.e., feasible home or community-based alternatives) and allow individuals to choose a waiver option as opposed to institutionalization.  42 U.S.C. § 1396n(c)(2)(C).  The interpreting regulations comport with this reading and expressly provide that covered individuals or their representatives must be both: "(1) Informed of any feasible alternatives available under the waiver; and (2) Given the choice of either institutional or home and community-based services."  42 C.F.R. § 441.302(d); *see also id.* § 441.303(d).

Circuit courts have agreed with this straightforward interpretation.  The Ninth Circuit in *Ball*, for example, explained that § 1396n(c)(2)(C) grants individuals "two explicitly identified rights—(a) the right to be informed of alternatives to traditional, long-term institutional care, and (b) the right to *choose* among those alternatives."  492 F.3d at 1107; *Doe v. Kidd*, 501 F.3d 348, 359 (4th Cir. 2007) (commenting that "the only choice referred to . . . is a choice between institutional or home-based and community-based services as a part of the waiver program").  Section 1396n(c)(2)(C) thus requires Defendants to inform Plaintiffs about any feasible

alternatives under the HCBS Waiver Program for each Murray resident and then—if waiver options are available—give guardians a choice between the two types of settings. *See Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 459 (7th Cir. 2007) (explaining that this subsection does not mandate the state to offer any particular option but "just requires the provision of information about options that are available"); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 388 (5th Cir. 2003) ("[A]t most, the plain language of § 1396n(c)(2)(C) affords a right of information only for waiver applicants.").

According to Plaintiffs, Defendants' insistence that they consider and accept CILA placements, via the ACCT process, deprives them of choice as between institutional and community options under § 1396n(c)(2)(C). (Post-Hr'g Mem. at 16–19; Post-Hr'g Reply at 11–14.) As a threshold matter, we are not convinced that Plaintiffs' theory falls under § 1396n(c)(2)(C), which protects guardian choice among settings once feasible waiver options are available. Defendants plainly have attempted to engage Plaintiffs and offer them alternative placements under the HCBS Waiver Program where possible. But the statute seems to presuppose that the individual entitled to information and choice is interested in community options. *See Grant*, 324 F.3d at 388. As Plaintiffs have rebuffed Defendants' efforts to offer waiver options—and thus preemptively chosen institutional care—it is not clear that the choice provision of § 1396n(c)(2)(C) continues to apply, or to what further choice it should apply.

But in any event, even if we have misconstrued Plaintiffs' theory or the scope of § 1396n(c)(2)(C), Defendants have not deprived Plaintiffs of their "choice of either institutional or home and community-based services" as a practical matter. 42 C.F.R. § 441.302(d). The record establishes that no Murray resident can or will be transferred into a CILA under the HCBS

Waiver Program over guardian objection.  (*Supra* Part IV.A.)  The record also establishes that

Defendants have expressed both a willingness and ability to accommodate families who wish to

choose institutional placements, even where counterproductive to the Initiative.  (*Supra*

Part IV.B.)  Under these circumstances, we cannot hold that Plaintiffs have any likelihood of

success on the merits of this § 1396n(c)(2)(C) claim.

## VII.    IRREPARABLE HARM

Although Plaintiffs have not shown a better than negligible likelihood of success on the

merits of their claims, we continue our analysis of the preliminary injunction motion.  We turn to

the irreparable harm element, which resolves "the case where although the ultimate relief that the

plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily

wait till the end of trial to get that relief."[28]  *Roland Mach. Co.*, 749 F.2d at 386.  In other words,

"[o]nly if [the plaintiff] will suffer irreparable harm in the interim—that is, harm that cannot be

prevented or fully rectified by the final judgment after trial—can he get a preliminary

injunction."  *Id.*; *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.  Plaintiffs contend that

Murray residents face injury to their health and well-being, both physical and mental, because of

"the predetermined placements which . . . [result] from going through the [ACCT process]" as

well as because of the "lack of meaningful choice" under § 1396n(c)(2)(C).  (Post-Hr'g Mem. at

25–26; *see also* Mem. ISO Prel. Inj. Mot. (Dkt. No. 9) at 20–21.)

Plaintiffs argue that the CILA placements, as predetermined through the ACCT process,

are dangerous.  Plaintiffs introduced troubling evidence of problems with certain CILA

---

[28] The parties did not separately address whether Plaintiffs lack an adequate remedy at law necessitating injunctive relief.  Plaintiffs seek only injunctive relief, and we assume for present purposes that they have met this requirement.  *See Roland Mach. Co.*, 749 F.2d at 386.

placements, causing their concerns about future (though speculative) errors, which could result in serious harm. (*Supra* Part V.) For their part, Defendants offered evidence that other former SODC residents have succeeded in the community and that similar problems arise at Murray as well. (*Id.*) While we are sympathetic to Plaintiffs' fears, and do not condone the mistakes made at certain CILAs, the record before us does not establish any level of likelihood that SODC residents "will suffer" irreparable harm in the absence of an injunction. *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375–76 (2008) (clarifying that the plaintiff must show "that irreparable harm is *likely* in the absence of an injunction," not just possible); *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("Speculative injuries do not justify this extraordinary remedy.").

Even if we accept Plaintiffs' assertion that residents transferred into CILAs are likely to suffer irreparable harm, such harms would not occur as a result of the much-maligned ACCT process. Neither Defendants, nor the ACCT process, require guardians to choose a CILA placement. Accordingly, granting an injunction to curtail the ACCT process during the pendency of this action, as Plaintiffs suggest, would not give Plaintiffs any relief or authority that they do not already possess.

Yet Plaintiffs also contend that the ACCT "process itself presents an irreparable harm." (Post-Hr'g Mem. at 25.) Plaintiffs have not introduced any evidence whatsoever that the ACCT process itself inflicts irreparable harm. Kelly testified that her son "might be upset" if required to meet strangers during the ACCT process. (1/7/14 Hr'g Tr. (Kelly) at 250.) While Kelly's concern is understandable, this evidence hardly establishes that either Murray residents or their guardians will suffer harm, let alone irreparable harm, simply by participating in the ACCT

process.  Plaintiffs' criticisms of Defendants' reliance on CRA staff and the Murray ISPs similarly do not reveal harm, irreparable or otherwise.  (*See Supra* Part III.B.2.)  Plaintiffs may feel that the ACCT process is a waste of their time and taxpayer money, but we cannot find that it causes irreparable harm.

## VIII.   BALANCING OF INTERESTS

At this point, we conclude that Plaintiffs' claims have not survived the threshold phase of the preliminary junction analysis.  Having determined that Plaintiffs have failed to show either a likelihood of success on the merits or irreparable harm, we must deny the requested injunction. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086; *Daveri Dev. Group, LLC*, 934 F. Supp. 2d at 995.  We briefly consider the balancing phase, should an appeal follow.  *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1087.

Utilizing a sliding scale approach, we balance the irreparable harm that Plaintiffs will suffer if relief is denied against the irreparable harm that Defendants will suffer if relief is granted.  *See Long*, 167 F. Supp. 2d at 990 (internal quotations omitted); *Planned Parenthood of Ind.*, 699 F.3d at 972.  We also factor in the public interest in the outcome of the motion.  *Long*, 167 F. Supp. 2d at 990; *Planned Parenthood of Ind.*, 699 F.3d at 972.  The purpose of this second phase is to "minimize the cost of potential error."  *Girl Scouts of Manitou Council*, 549 F.3d at 1086.

As discussed above, Plaintiffs have not established that they will suffer irreparable injury without an injunction.  Defendants, on the other hand, argue that an injunction would "impermissibly interfere with the State's right to administer its budget and make policy decisions."  (Post-Hr'g Resp. at 23.)  They further argue that an injunction would exacerbate the

financial burden on taxpayers and impede the Initiative. (*Id.*) While Defendants contend that this balance of harms tips in their favor, they do not claim to face *irreparable* harm should an injunction issue. (Post-Hr'g Resp. at 23–25.) Thus, neither party faces irreparable harm from our ruling. A preliminary injunction is an extraordinary remedy, *Roland Mach. Co.*, 749 F.2d at 389, and is not warranted under such circumstances. *See also Daveri Dev. Group, LLC*, 934 F. Supp. 2d at 995 (noting that a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion").

Before concluding, we recognize the public interest in this action, as well as the parties' interests. As we have previously stated, this case has important ramifications for both sides, as well as the citizens of Illinois. Plaintiffs are confronted with a most unwelcome development in Murray's expected closure. They have legitimate worries about the placements, transitions, and future care of their loved ones.[29] Meanwhile, Defendants seek to improve efficiency by serving more citizens, to effectuate public policy favoring the integration of the disabled when feasible, and to potentially improve the state budget. The employees of Murray, residents of Centralia, and service providers for Murray residents naturally have their own concerns and interests. And the taxpayers across Illinois are invested in this litigation as well, both as contributors to the State budget and as citizens concerned about the care of the State's disabled population. Some of

---

[29] Plaintiffs assert that CILA residents—and their neighbors—are threatened by ill-advised CILA placements. (Post-Hr'g Mem. at 26–27.) Plaintiffs did not identify evidence supporting their claim that the alleged danger to CILA residents extends to their neighbors, and we are not inclined to adopt their conclusion without more. (*See id.* at 27 (focusing on threats to the developmentally disabled, not their neighbors).)

these interests may conflict, some do not, but all are important.

We are not unsympathetic to the real human concerns raised by Plaintiffs in their diligent and highly professional advocacy as guardians, on behalf of their loved ones as well as other families facing this predicament. We recognize that Murray's closure may cause distress and disruption for Plaintiffs, their wards, and their families. In the end, however, we cannot grant them legal relief on the record before us, which does not permit us to conclude that Plaintiffs' interests outweigh Defendants' interests, particularly given Plaintiffs' lack of likelihood of success on the merits and lack of irreparable harm. *See Planned Parenthood of Ind.*, 699 F.3d at 972 ("The strength of the moving party's likelihood of success on the merits affects the balance of harms."); *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

## CONCLUSION

For the reasons detailed above, we deny Plaintiffs' motion for preliminary injunction (Dkt. No. 8). We also lift the temporary restraining order previously entered on June 12, 2013 (Dkt. No. 90).[30] It is so ordered.

_____
Honorable Marvin E. Asper
U.S. District Court Judge

Dated: July 21, 2014

_____

[30] As suggested earlier, Defendants should consider clarifying for Murray families exactly how and to whom guardians should express their wishes to decline or cease participation in the ACCT process, the full ramifications of that decision, and how guardians should proceed to obtain individualized assessment and future placement outside the ACCT process.